OPINION OF THE COURT
Jacqueline W. Silbermann, J.
Stephen J. Harkavy, the Deputy Director of the Mental Hygiene Legal Service (MHLS), petitions this court for a writ of habeas corpus, pursuant to CPLR article 70, seeking the immediate release of 12 ex-prisoners, who were transferred from prison to a psychiatric hospital at the conclusion of their terms of imprisonment, ostensibly as a means of avoiding their release. The civil confinement was accomplished pursuant to section 9.27 (a) of the Mental Hygiene Law, which provides for the involuntary hospitalization of persons who are mentally ill, in need of involuntary care and treatment, and who pose a danger to themselves or society. Petitioners contend that the State failed to follow the proper procedures in transferring inmates to a mental hospital, which is governed by section 402 of the Correction Law, and that they were denied their right, guaranteed by the United States Constitution, to notice and an opportunity to be heard before being transferred from prison into a mental health institution.
The petition, brought by order to show cause, was returnable on November 2, 2005. On that date, the court granted, without opposition, petitioners’ motion to amend the caption of this proceeding and to proceed anonymously. At that time, respondent served and filed its return. On November 3rd, counsel for petitioners sought permission to file a reply to return. By letter dated November 7, 2005, counsel for respondent filed a response to the reply. The court has carefully considered each of these submissions.
Since 1999, at least five bills have been introduced in the New York Legislature proposing involuntary civil confinement of sex offenders. (See 2005 NY Assembly Bill A 3394; 2003 NY Assembly Bill A 7125; 2003 NY Assembly Bill A 6754; 2001 NY Assembly Bill A 3715; 2001 NY Assembly Bill A 3218.) In early October of this year, it was widely reported in the press that Governor Pataki could not wait any longer for the Assembly leadership to act on his proposal. (See, e.g., Alan Feuer, Pataki Uses State Law to Hold Sex Offenders After Prison, New York *853 Times, Oct. 4, 2005, at 4, col 1.) Charging state officials to “push the envelope” with the application of existing state law, the Governor ordered state correction and mental hygiene authorities to begin evaluating every sexually violent predator in state prisons before their release to determine if they should be civilly confined.
Petitioner John Doe No. 1 was scheduled to finish serving his maximum prison sentence on October 6, 2005, after serving consecutive l-to-3-year sentences for sodomy in the second degree and sexual abuse in the first degree. He was not released, but was transferred on October 6, 2005 to the Manhattan Psychiatric Center from the Eastern Correctional Facility on the application of the prison superintendent. The superintendent’s application “recommend[s] that Mr. [Doe] be civilly committed to a psychiatric hospital upon release from prison as a sexually violent predator (SVP), for further evaluation and treatment.” (Petition, exhibit A thereto.) The application is accompanied by certifications of two prison psychiatrists. Dr. Khan opined that John Doe No. 1 suffers from pedophilia and is in need of psychiatric treatment at an inpatient facility due to a high risk of recommitting sexual crimes. According to the second psychiatrist, John Doe No. 1 needs to be in an inpatient setting for evaluation and treatment of pedophilia.
In addition to John Doe No. 1, 11 other men alleged to be SVPs were, at the conclusion of their prison terms, transferred to the Manhattan Psychiatric Center between September 23 and October 21, 2005, and some were further transferred to Kirby Forensic Psychiatric Center. The applications for commitment were all made by the superintendent of the prison facility where the prisoners were being confined.[1]
All 12 petitioners were committed to the Manhattan Psychiatric Center pursuant to the provisions of section 9.27 (a) of the Mental Hygiene Law. This section provides for the civil commitment of persons who are “mentally ill and in need of involuntary care and treatment.” The phrase “in need of involuntary care and treatment” is defined in Mental Hygiene Law § 9.01 as meaning “a person has a mental illness for which care and treatment as a patient in a hospital is essential to such person’s *854 welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment.” In addition, there must be proof that the patient poses a substantial threat of physical harm to themselves or others. (Matter of Yvette S. v Sanchez, 229 AD2d 320 [1st Dept 1996]; Matter of Jeannette S., 157 AD2d 783, 783-784 [2d Dept 1990]; see also Goetz v Crosson, 967 F2d 29, 31 [2d Cir 1992], cert denied 516 US 821 [1995].) Mental Hygiene Law § 9.27 provides for an involuntary admission to a hospital, based upon the certificates of two examining physicians, accompanied by an application made by a person authorized by subdivision (b). Aiter the transfer, the person must be examined forthwith by a member of the psychiatric staff of the hospital who must concur in the opinion of the two examining physicians that hospitalization is required. (Mental Hygiene Law § 9.27 [e].) The period of retention without court approval is limited to 60 days. (Mental Hygiene Law § 9.33 [a].) At any time during this period the patient may request a hearing on the need for continued commitment. A hearing must be held within five days of such a request after which the court may grant or deny the patient’s application for release. (Mental Hygiene Law § 9.31.)
Petitioners argue that the applications for their detention are invalid under Mental Hygiene Law § 9.27, because a prison superintendent is not an authorized applicant under subdivision (b) of the statute. However, a prison superintendent can be an authorized applicant under subdivision (b) (4), which provides that applications for involuntary admission may be executed by “an officer of any public or well recognized charitable institution or agency or home in whose institution the person alleged to be mentally ill resides.” Petitioners’ reading of this language as applying only to a charitable institution ignores the words “public or well recognized” which clearly apply to all three types of facilities — institution, agency or home.
Petitioners next argue that their transfer into the mental health system was accomplished illegally, because the State failed to comply with the procedures laid out in Correction Law § 402, which govern transfers of mentally ill prisoners to mental hospitals. Section 402 of the Correction Law differs substantially from Mental Hygiene Law § 9.27 (a), firstly, because court intervention is required before a prisoner is transferred to a mental hospital, and secondly, because the examination is conducted by independent physicians appointed by the court. More specifically, section 402 (1) provides that whenever a *855 prison physician shall report in writing to the superintendent that an inmate is mentally ill, the superintendent shall apply to a judge to cause an examination to be made of the inmate by two independent examining physicians[2] designated by the judge. If both physicians certify that the prisoner is mentally ill and in need of care and treatment, the superintendent must then petition the court for an order committing such inmate to a hospital for the mentally ill. (Correction Law § 402 [3].) Written notice of the petition must be personally served on the prisoner, and a copy served on a close relative and the MHLS. If no demand for a hearing is made, the judge, if satisfied that the inmate is mentally ill and in need of care and treatment, may issue an order for his confinement to a psychiatric hospital for a period not to exceed six months. If a hearing is requested, the judge must hear the testimony and may examine the inmate, and render a written decision. Again, civil commitment is limited to six months, and can only be extended by further order of the court upon application of the director of the hospital. (Correction Law § 402 [10].)
Although respondent concedes that each of the petitioners were in the custody of the Department of Correctional Services (DOCS) at the time that they were examined and certified for involuntary commitment to a mental hospital, respondent purports to justify the failure to follow the procedures mandated by the Correction Law on the ground that section 402 (1) pertains only to a “person undergoing a sentence of imprisonment,” and contends that since the petitioners were either being conditionally released, or were being released to parole supervision, or were being released because their term of imprisonment expired, they were no longer undergoing a sentence of imprisonment. But the plain truth of the matter is that each of the petitioners were, in fact, imprisoned at the time of their civil commitment. Thus, state officials were bound by the procedures mandated in the Correction Law, which comply with the due process protections laid out by the United States Supreme Court in Vitek v Jones (445 US 480 [1980]). In Vitek, the Supreme Court ruled that a criminal conviction and sentence of imprisonment do not authorize the State to classify an inmate as mentally ill and subject him to involuntary psychiatric treatment without affording him certain due process *856 protections such as prior written notice and a hearing before an independent decision maker. The fact that DOCS has utilized Mental Hygiene Law § 9.27 to civilly commit prisoners about to be released from the Sing Sing Correctional Facility on about five occasions since 2003 does not render the present utilization of this statute proper.
While respondent argues that the provisions of section 402 of the Correction Law could not have been utilized since the petitioners were about to be released from custody, she fails to explain why these men, alleged to be mentally ill and in need of hospitalization, were not hospitalized during their incarceration in accordance with section 402. As their release dates drew near, the hospital director could then apply pursuant to Correction Law § 404 for their continued detention in accordance with the Mental Hygiene Law after the term of imprisonment had expired.
There can be no doubt that the Governor and state officials have a very valid concern about the risks posed to the public by repeat sex offenders. Nevertheless, that some of the petitioners may involuntarily have been placed in the mental health system by executive fiat is a possibility which this court cannot ignore. Mental Hygiene Law § 9.27 (c) requires that the “application shall contain a statement of the facts upon which the allegation of mental illness and need for care and treatment are based . . . .” In the case of John Doe Nos. 2, 6, and 8, the Attica Superintendent’s application does not give any facts regarding the mental condition of any of these men, but each states only that: “Mental Health has determined that this individual requires further evaluation and risk assessment at Manhattan Psychiatric Center.” (Petition, exhibits B, F, H.) John Doe Nos. 2, 3, and 9 had not been receiving any psychiatric care while incarcerated, and their alleged need for psychiatric care and treatment of a mental illness only arose as their release date from prison drew near. John Doe Nos. 3 and 7 were diagnosed only with antisocial personality disorder, but according to the American Psychiatric Association, 75% of the prison population meets the criteria for this disorder. John Doe No. 11 alleges that his medical evaluation consisted of a 10-to-15-minute interview conducted by teleconference, and that one of the examining physicians thereafter admitted that she did not want to send him to a psychiatric hospital, but that a directive had “come down from Albany.” (Reply to return, exhibit 11 11 4.) Requiring DOCS to follow the procedures mandated by the Correction *857 Law, where court intervention is required before an inmate can even be evaluated for psychiatric confinement, would help ensure that this type of alleged misuse of the mental health system could not occur.
The court takes no issue with the State’s belief that each of these men poses a danger to society. However, even persons acquitted of violent crimes by reason of insanity may not be civilly committed to a mental hospital solely because they pose a danger to society. A showing of mental illness and a need for inpatient care and treatment is also required. (Matter of Torsney [State Commr. of Mental Hygiene — Gold], 47 NY2d 667, 675 [1979] [“Clearly, the Mental Hygiene Law requires for involuntary civil commitment that the patient be mentally ill and in need of immediate in-patient treatment. Absent such a finding, a dangerous propensity is, in itself, insufficient to permit involuntary commitment”].)
Accordingly, this court finds that the petitioners were deprived of the due process protections afforded to prisoners under the provisions of section 402 of the Correction Law, and are being illegally detained.
Respondent argues against the immediate release of the petitioners on the ground that this habeas corpus proceeding is governed by the provisions of Mental Hygiene Law § 33.15, not CPLR article 70. Mental Hygiene Law § 33.15 (b) requires that “[u]pon the return of such a writ of habeas corpus, the court shall examine the facts concerning the person’s alleged mental disability and detention.” In other words, respondent contends that the statute does not contemplate the release of individuals based on procedural errors, and that a substantive review of the person’s mental state must be conducted by the court before it can order their immediate release. In People ex rel. Thorpe v Von Holden (63 NY2d 546 [1984]), the Court of Appeals held that a CPL 330.20 defendant was not entitled to release based on procedural errors in his commitment process, but that the proper disposition of the writ application was a conditional order releasing the defendant unless a hearing on his retention application is begun and concluded expeditiously. Here, too, we are dealing with a class of individuals who have already demonstrated acts of violence showing an immediate threat to society. (Von Holden at 555.) Accordingly, the proper disposition of this habeas application is a conditional order releasing the petitioners unless respondent allows for the expeditious examination of each of the petitioners by two independent examining physi *858 dans to be appointed by the court. Both physicians must certify that each of the petitioners are mentally ill, in need of care and treatment at a psychiatric hospital, and pose a substantial threat of physical harm to themselves or others. Respondent must immediately release any petitioner that is not certified by both independent examining physicians, and for any petitioners who are deemed in need of involuntary confinement by both independent examining physicians, the provisions of Correction Law § 404 and Mental Hygiene Law § 9.33 are then to be followed.
Accordingly, for the foregoing reasons it is hereby ordered and adjudged:
1. That the writ of habeas corpus is hereby sustained.
2. That the petitioners (John Doe Nos. 1-12) shall be conditionally discharged from the custody of respondent Eileen Consilvio, Executive Director of the Manhattan Psychiatric Center and the Kirby Forensic Psychiatric Center, and from further detention under and by virtue of the applications made pursuant to Mental Hygiene Law § 9.27 while each of the prisoners was in custody of the DOCS, as directed herein.
3. That respondent Eileen Consilvio is directed to allow for the examination of each of the petitioners by two independent examining physicians to be appointed by the court within five business days of their appointment. Respondent must immediately release any petitioner that is not certified by both independent examining physicians as mentally ill, in need of care and treatment at a psychiatric hospital, and posing a substantial threat of physical harm to themselves or others. For any petitioners who are deemed in need of involuntary confinement by both independent examining physicians, the provisions of Correction Law § 404 and Mental Hygiene Law § 9.33 are to be followed.

. With respect to John Doe No. 9, the court notes that the application for his admission to Central New York Psychiatric Center was, in fact, made by the Superintendent of the Auburn Correctional Facility on September 23, 2005, and that he was later transferred to Manhattan Psychiatric Center. (See return, exhibit 3.)

. Section 400 (1) of the Correction Law defines “examining physician” as meaning “a physician licensed to practice medicine in the state of New York, but who is not on the staff of the facility where the inmate is confined.”