Bailey v. Pataki

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 31, 2011          Decided: February 14, 2013)

Docket No. 10-2563

------------------------------------

Kenneth Bailey,

Plaintiff - Appellee,

Robert Trocchio, Jorge Burgos, Jr., Louis Massei, Robert Warren, Charles Brooks,

Consolidated Plaintiffs - Appellees,

v.

George Pataki, former Governor of New York State, Eileen Consilvio, former Executive Director, Manhattan Psychiatric Center and Kirby Forensic Psychiatric Center, John Doe, # 1, Commissioner of the New York State Department of Corrections, John Doe, # 2, Commissioner of the New York State Office of Mental Health, John Doe, # 3, Superintendent of Wyoming Correctional Facility, John Doe, # 4, Superintendent of Attica Correctional Facility, John Doe, # 5, Superintendent of the Downstate Correctional Facility, John Doe, # 6 through 20, medical personnel who examined and evaluated plaintiff pursuant to New York State Mental Hygiene Law Article 9, Glenn S. Goord, Sharon Carpinello, Michael Giambruno, James Conway, Paul Annetts, Emilia Rutigliano, Prabhakar Gumbula,  Allan Wells,

Defendants - Appellants,

Jonathan Kaplan, Olusegun Bello, Mary Ann Ross, Ayodeji Somefun, Michal Kunz, William Powers, Lee E. Payant, Lawrence Farago, Luis Hernandez, Samuel Langer, Robert Dennison, Former Chairman of the New York State Board of Parole and Chief Executive Officer of the New York State Division of Parole, Jeffrey Tedford, Former Deputy Superintendent of Security at Clinton Correctional Facility, William J. Sackett, Facility Senior Parole Officer, Clinton Correctional Facility, Jean Liu, psychiatrist who evaluated plaintiff for possible civil commitment, Abadul Qayyum, Charles

Chung, Dale Artus, Former Superintendent of Clinton Correctional Facility,

Consolidated Defendants - Appellants.

-------------------------------------

Before:   McLAUGHLIN, SACK, and HALL, Circuit Judges.

This is an appeal from an order of the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) denying the defendants' motion for summary judgment.  The defendants argue that they are entitled to qualified immunity on the plaintiffs' 42 U.S.C. § 1983 procedural due process claims because the procedures employed in the course of civil commitment proceedings against the plaintiffs complied with due process requirements, and because, even if they did not, a reasonable person in the defendants' position would not have known that he was violating the plaintiffs' constitutional rights.  We conclude that the district court properly denied the defendants' motion for summary judgment.  There is sufficient evidence which, when viewed in the light most favorable to the plaintiffs, supports their claim that they were denied their right to procedural due process before being civilly committed. We also agree with the district court that a reasonable official in the defendants' position would have known that the process by which the plaintiffs were committed did not satisfy basic constitutional requirements and that the defendants are therefore not entitled to qualified immunity.

Affirmed.

2

AMEER BENNO, Benno & Associates, New York, NY, (Richard Sullivan, Jeffrey Rothman, on the brief), for Plaintiffs-Appellees.

CECELIA C. CHANG, Assistant Solicitor General, (Barbara D. Underwood, Solicitor General, Benjamin N. Gutman, Deputy Solicitor General, on the brief), for Andrew M. Cuomo, Attorney General of the State of New York, New York, NY, for Defendants-Appellants.

SACK, Circuit Judge:

This appeal requires us to decide whether the civil commitment of the plaintiffs following the expiration of their sentences for sexually based criminal offenses constituted violations of their procedural due process rights redressable under 42 U.S.C. § 1983, and, if so, whether the defendants are nonetheless entitled on the record before the district court to summary judgment dismissing the procedural due process claims on the grounds of qualified immunity.

The plaintiffs' commitments were effected not through the state's normal civil commitment procedures, but by means of an executive-branch effort aimed at preventing the release of some "sexually violent predators" ("SVPs"). The Governor of New York State at the time, Governor George E. Pataki, directed the State's Office of Mental Health ("OMH") and Department of Correctional Services ("DOCS") to develop a plan whereby he could take executive action to implement an initiative (the "SVP

3

Initiative" or the "Initiative") that would result in the involuntary commitment of selected SVPs to state psychiatric facilities after the expiration of their criminal sentences. The plaintiffs, who were committed pursuant to this initiative, assert a variety of claims against Governor Pataki and officials of OMH and DOCS.

In this appeal, the defendants assert that the district court erred when it denied their motion for summary judgment on the plaintiffs' procedural due process claims, concluding that the defendants are not entitled to qualified immunity. The plaintiffs' claims for denial of procedural due process are premised on the allegation that they were committed pursuant to the SVP Initiative without the benefit of notice or an opportunity for a hearing prior to their commitment.

We agree with the district court that there is sufficient evidence in the record to support the plaintiffs' procedural due process claims and therefore defeat the motion for summary judgment. We also conclude that at the time of the Initiative, the constitutional principle that, absent some emergency or other exigent circumstance, an individual cannot be involuntarily committed to a psychiatric institution without notice and a predeprivation hearing was firmly established. Because the law pertaining to the involuntary civil commitment of prisoners was firmly established, the district court properly determined that the defendants should not enjoy qualified immunity.

4

**BACKGROUND**

<u>The SVP Initiative</u>

In June 2005, a recently-paroled sex offender murdered a woman in the parking lot of the Galleria Mall in White Plains, New York. Governor Pataki had previously attempted to enact legislation providing additional avenues for the commitment of dangerous sex offenders,[1] but after the murder, "momentum to do something around [sic.] dangerous sex offenders increased," according to associate director of OMH's Forensic Services Division, Richard Miraglia, who participated in the creation and implementation of the SVP Initiative. Dep. of Richard Miraglia, Nov. 24, 2009 ("Miraglia Dep."), at 62; Joint App'x at 147. In an October 2005 press release, Governor Pataki's office explained that during this time period he "directed that every sexually violent predator (SVP) in State custody be evaluated for involuntary civil commitment before being released from prison. He directed [OMH] and [DOCS] to push the envelope of the State's existing involuntary commitment law because he couldn't wait any longer for the Assembly Leadership to bring his legislation to

---

[1] Beginning in 1998, shortly before the end of his first term in office, Governor Pataki tried to convince the New York State legislature to pass sex offender civil commitment legislation, but, he said in a televised interview, the state Assembly leadership would not permit a floor vote. Tr. of Interview of George E. Pataki by Bill O'Reilly, FOXNews.com, Nov. 18, 2005; Joint App'x at 274. Those opposing the measure, the Governor said, were making "the same old argument. There are those who would rather have 50 sexual predators out on the street than one who they believe might have been wrongfully confined." Tr. of Interview of George E. Pataki by Glenn Beck, July 16, 2007; Joint App'x at 590.

the floor for a vote."  Press Release, N.Y. State Executive Chamber, Governor: U.S. Dep't of Justice Adds N.Y. to Nat'l Sex Offender Public Registry Web Site (Oct. 24, 2005); Joint App'x at 215.

In order to put the governor's policy into effect, OMH officials began engaging in daily discussions about how to implement a civil commitment initiative.  Miraglia testified that the "general tenor" of these meetings reflected "concern about dangerous repeat sex offenders being released to the community" and "some frustration about legislative inaction."  Miraglia Dep. at 48; Joint App'x at 136.  Discussions eventually centered on using either Correction Law § 402 or Mental Hygiene Law § 9.27 for this purpose.  The two statutes are substantially different.

Section 9.27 of the Mental Hygiene Law ("MHL"), codified in Article 9 of the MHL and entitled "Involuntary admission on medical certification," allows the director of a hospital to accept any patient "alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians."  MHL § 9.27(a).  The director must also receive a sworn application explaining why the patient needs mental health treatment.  Id.  After the patient arrives at the hospital, a member of the hospital's psychiatric staff is required to examine him and confirm that he should be admitted. MHL § 9.27(e).  The law requires that the nearest relative of the patient, or any other person the patient has designated, be given notice of the involuntary admission within five days of

6

admission. MHL § 9.29(b). Within sixty days of admission, the patient or a friend or relative can request a hearing on the involuntary admission, which is required to be held within five days of receipt by the hospital director of notice of the request. MHL § 9.31(a). If no hearing has been held or court order issued, or if the patient does not consent to the admission, the hospital director is required to seek a court order within sixty days of the patient's involuntary admission if the director wishes to pursue the matter. MHL § 9.33(a).

Correction Law § 402 is entitled "Commitment of mentally ill inmates." Under that law, if a staff physician at a prison informs the prison superintendent that an inmate is mentally ill, the superintendent asks a "judge of the county court or justice of the supreme court in the county" to appoint two physicians to examine the inmate. Correction Law § 402(1). If both physicians conclude that hospitalization is appropriate, they must produce certificates to that effect. Id. The superintendent is then required to apply to the court for a commitment order, and personally serve notice on the inmate and his or her closest relative or, if relatives are unknown or not within the state, "any known friend," five days prior to the commitment. Correction Law § 402(3). The Mental Hygiene Legal Services must then inform the inmate (or, in appropriate cases, others concerned with the inmate's welfare) of "the procedures for placement in a hospital and of the inmate's right to have a hearing, to have judicial review with a right to a jury trial, to

7

be represented by counsel and to seek an independent medical opinion." Id. The inmate is entitled to request a hearing before a judge prior to any transfer to a psychiatric hospital. Correction Law § 402(5). The procedural protections in section 402 may only be bypassed where admission to a hospital is sought on an emergency basis. Correction Law § 402(9).

The state officials dealing with the matter ultimately decided that MHL § 9.27 would be the appropriate law through which to implement the SVP Initiative. The parties disagree as to whether MHL § 9.27 had previously been utilized for the civil commitment of inmates. Scott Clair, who worked for OMH at Attica Correctional Facility between 1976 and 2005, testified that use of Correction Law § 402 was standard procedure for the civil commitment of prisoners, and that he was unfamiliar with MHL § 9.27. Dep. of Scott Clair, January 14, 2010 ("Clair Dep."), at 43-44; Joint App'x at 1200-01. Hal Smith, who served as executive director of the Central New York Psychiatric Center, an OMH facility, similarly testified that prior to the SVP Initiative, inmates were transferred from DOCS to OMH facilities pursuant to the Correction Law, not the Mental Hygiene Law. Dep. of Hal E. Smith, November 11, 2009 ("Smith Dep."), at 162-63, 166, 169; Joint App'x at 1256-59. In a related state court proceeding, the state Attorney General represented that MHL § 9.27 had been used five times between 2003 and 2005 to civilly commit prisoners. State ex rel. Harkavy v. Consilvio, 10 Misc. 3d. 851, 856, 809 N.Y.S.2d 836, 839-40 (Sup. Ct. 2005), rev'd, 29

A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't), rev'd, 7 N.Y.3d 607, 859 N.E.2d 508, 825 N.Y.S.2d 702 (2006).

Sharon Carpinello, Commissioner of the OMH, presented the proposed SVP Initiative, utilizing MHL § 9.27, to Governor Pataki. The proposal called for a pool of SVPs to be identified based on upcoming release dates. The pool of inmates was drawn from those who had committed a violent offense as defined by New York Penal Law § 70.02, and a sex offense as defined by Penal Law § 130, as well as from another list of inmates who had committed felonies involving some sexual motivation. According to Dawne Amsler, Associate Director of OMH's Bureau of Forensic Research, this constituted a departure from prior practice. Previously, MHL § 9.27 applied to "individuals who have a mental illness that makes them dangerous to themselves or others," and inmates who did not fit that criteria were evaluated prior to their release pursuant only to Correction Law § 402. Dep. of Dawne Amsler, Nov. 10, 2009 ("Amsler Dep."), at 21, 27; Joint App'x at 502-03. Amsler testified that "individuals who were already on the mental health caseload at OMH and receiving fairly intensive services were evaluated at the end of their [sentences] regardless of the crime they committed and perhaps committed if deemed necessary. This changed [after implementation of the Initiative] in that all sex offenders regardless of whether or not they were on caseloads were evaluated." Id. at 36; Joint App'x at 506.

Under the Initiative, the identified inmates would be subject to a review of their criminal histories, and then to an

9

examination by two physicians, who would determine whether they posed a risk to the public, or suffered from a mental illness, and therefore needed inpatient care and treatment. If the physicians recommended civil commitment, the inmate would be transferred to a psychiatric center and examined by a psychiatrist to confirm the diagnosis. Once admitted to the facility, the inmate would begin undergoing a specialized course of treatment.

Implementation of the Initiative began almost immediately. Under Defendant Glenn Goord's direction, DOCS identified SVPs scheduled for release and made the presentence reports for those inmates available to OMH. OMH then compiled relevant information on the inmates, including their "OMH level," which did not include a specific diagnosis, and a description of the offense of conviction. Between September 2005 and January 2006, Amsler personally compiled the information about the identified inmates and provided that information to OMH personnel. She completed two documents for each inmate, a "FPMS/DMHIS" overview and a "Static 99" evaluation. Pls.' Statement of Uncontested Material Facts Pursuant to Local Rule 56.1, at ¶ 85; Joint App'x 87, citing Amsler Dep.[2]

Every inmate identified by DOCS as a potential SVP was evaluated for civil commitment by OMH. Any inmate who refused to submit to the evaluation was subject to disciplinary action and

---

[2]    Amsler did not know what the initials "FPMS" stood for. Amsler Dep. at 122; Joint App'x at 546.

refusal could have constituted a parole violation.  The DOCS Superintendent then applied for the civil commitment of SVP inmates who had been deemed to meet the criteria for civil commitment and had been examined by two physicians who had so certified.  The inmates received no advance notice that they would be transferred or subject to a civil commitment evaluation.

While the procedures for commitment used in the SVP Initiative tracked MHL § 9.27, the standard for commitment was different from that ordinarily used under the provision, which caused concern among those charged with implementing the Initiative.[3]  Miraglia testified that officials had only days to develop the techniques for assessing whether SVPs qualified for commitment under the Initiative.  "[T]he sex offender assessment is a specialty . . . that heretofore [had] not been within the OMH menu of services. . . .  So we needed to develop that capacity to understand what . . . assessment techniques would be required to identify those at highest risk for sexual recidivism."  Miraglia Dep. at 69; Joint App'x at 154.

One person involved with the Initiative wrote in an e-mail under a heading "Operational Concerns and Challenges," that

---

[3]     The standard itself is not at issue in this appeal. The plaintiffs' substantive due process claim challenging whether the standard for commitment utilized was appropriate is not before us.  See Bailey v. Pataki, No. 08 Civ. 8563, 2010 WL 4237071, at *4, 2010 U.S. Dist. LEXIS 113766, at *13 (S.D.N.Y. Oct. 26, 2010)(denying defendants' motion for summary judgment on the substantive due process claims).  The uncertainty regarding the standard used is nevertheless relevant to the procedural due process analysis because it compounds the risk of an erroneous deprivation of a liberty interest.

"[e]xpertise in the treatment of sexual offenders is not widely available among current OMH staff, and the majority of clinicians have not had any experience with this population. Training clinicians who are unfamiliar with the sexual offender population to apply civil commitment criteria to these individuals may be difficult." Email from Robyn Katz to Carpinello, Miraglia et al. (July 29, 2005, 6:25 p.m.); Joint App'x at 593. Scott Clair, a Forensic Unit Chief of the mental health unit at Attica, explained that the "criteria" utilized to evaluate the inmates identified as SVPs was "dangerousness to self or others." Clair Dep. at 46; Joint App'x at 1203. Correction Law § 402 used the same criteria, but, Clair testified, "[i]nmates that went on 402 were clinically decompensated to the point where they were dangerous to self or others at that exact time," while those under the SVP Initiative were evaluated "based on dangerousness to the community based on the risk assessment and their diagnosis." Id. at 47; Joint App'x 1204.

Another OMH physician explained that she was "asked to make a prediction of the risk of possible recidivism to keep the community safe," whereas the Article 9 standard, by contrast, "is based on if the individual is harmful to himself and others and that if this is deemed the case then the certification is good for a period of 72 hours." Dep. of Mary Ann Ross, Sept. 24, 2009, at 437-39; Joint App'x at 1671-73.

The SVP Initiative's evaluation was based in part on the Static 99 form, which estimated an inmate's risk of future

12

recidivism in five, ten, and fifteen years, and which had not previously been used in the State's civil commitment process. When the Initiative began, most of the OMH physicians did not have any experience using the Static 99 form, and some were "not comfortable" using it. Smith Dep. at 157; Joint App'x at 1255.

The Plaintiffs' Commitment

Plaintiff Kenneth Bailey was among the first to be evaluated pursuant to the new Initiative. He and the other plaintiffs contend that had it not been for its implementation, they would not have been evaluated for civil commitment at all. Bailey had been convicted multiple times for sexual abuse of children and has admitted to molesting twenty-three girls. His most recent conviction stemmed from the repeated sexual abuse of his daughter for which, in 1994, he was convicted and sentenced to six to twelve years imprisonment. Some eleven years later, on September 28, 2005 -- less than two weeks before he was scheduled for release -- Bailey was transferred from Wyoming Correctional Facility to Attica Correctional Facility. Three days before his scheduled release, two OMH physicians evaluated Bailey for involuntary civil commitment pursuant to the Initiative. Both physicians produced written certificates stating that Bailey qualified for civil commitment.

When Bailey's sentence expired, the Superintendent of Attica applied for Bailey's involuntary commitment and DOCS transported Bailey to the Manhattan Psychiatric Center ("MPC") the same day. Bailey did not request a hearing following his

13

commitment because he apparently thought he would be at MPC for only a few weeks or months.  He contends that he was not aware that he was a psychiatric patient there.  The commitment proceedings for the other plaintiffs in this action followed similar patterns.  See Bailey v. Pataki, 722 F. Supp. 2d 443, 448-49 (S.D.N.Y. 2010).

The plaintiffs petitioned for habeas corpus relief in state court, arguing that the use of MHL § 9.27, rather than Correction Law § 402, to civilly commit them was illegal.  State ex rel. Harkavy v. Consilvio, 7 N.Y.3d 607, 859 N.E.2d 508, 825 N.Y.S.2d 702 (2006).  In Harkavy, the New York Court of Appeals commented: "[W]e understand how in an attempt to protect the community from violent sexual predators, the State proceeded under the Mental Hygiene Law."  The court concluded, however, that "because inmates who are incarcerated do not pose an immediate threat to the community, there should be ample time to proceed under the Correction Law."  Id. at 614.  The court ordered that each civilly committed individual be provided "an immediate retention hearing pursuant to article 9," and directed that future proceedings against inmates proceed under Correction Law § 402 "with all its attendant procedural requirements including court supervision, pretransfer notice and an opportunity to be heard within a reasonable period of time prior to the inmate's proposed release date."  Id.  The court did not decide on the constitutionality of applying Article 9 to prisoners.  In a concurrence by Judge Robert S. Smith, however,

14

he cautioned that it "would raise serious constitutional problems" because "Petitioners had all been in prison for years before the State sought to commit them civilly. No sudden, unforseen emergency required their confinement in a mental hospital." Id. at 615.

<u>The District Court Opinion</u>

In October 2008, the plaintiffs filed this action alleging claims under 42 U.S.C. § 1983 for violations of their Fourteenth Amendment rights to procedural and substantive due process and to equal protection, and their Fourth Amendment right against unreasonable seizure, under 42 U.S.C. § 1985(3) for conspiracy, and under various provisions of New York State law. On March 31, 2010, both sides moved for summary judgment. The district court (Jed S. Rakoff, <u>Judge</u>) denied the plaintiffs' motion for summary judgment in full, and granted in part and denied in part the defendants' motion for summary judgment.[4] Relevant to this appeal, the district court rejected the defendants' argument that they are entitled to qualified immunity on the plaintiffs' procedural due process claim.

In its opinion, the district court first addressed whether the plaintiffs had made out a procedural due process claim for their "involuntar[y] commit[ment] to civil confinement without advance written notice, an evaluation by court-appointed

_____

[4]    The district court entered a separate opinion detailing its decision on all issues other than qualified immunity. <u>See</u> <u>Bailey</u>, 2010 WL 4237071, at *1, 2010 U.S. Dist. LEXIS 113766, at *3-*4 (explaining the different opinions and orders issued).

physicians, and . . . a predeprivation judicial hearing." Bailey, 722 F. Supp. 2d at 447. The court explained that a confined prisoner "presents no immediate danger to the community, [therefore] full due process must be accorded before he can be transferred, upon completion of his sentence, to involuntary civil commitment." Id. at 447-48. Relying on Vitek v. Jones, 445 U.S. 480 (1980), the court determined that such process must include notice and "a predeprivation adversary hearing . . . at which the prisoner can see the evidence for the commitment and be given an opportunity to be heard in person, as well as present testimony and engage in cross-examination of the state's witnesses." Bailey, 722 F. Supp. 2d at 448.

The district court then examined whether the process it had determined was constitutionally required had been afforded to the plaintiffs in this case. It concluded that the "plaintiffs' civil confinement did not remotely comport with constitutional requirements." Id. at 449.

Having thus decided that, viewed in the light most favorable to the plaintiffs, the evidence supported the due process claims, the district court then considered whether the defendants were entitled to qualified immunity because the right at issue was not "clearly established" when the Initiative was implemented. The court determined that it was clearly established at the relevant time that in the absence of any "immediate danger to society," a predeprivation hearing was required before civilly committing an individual and that this

16

requirement was "so obvious that no reasonable defendant official could have failed to miss it." Id. at 450-51.

The district court emphasized that Correction Law § 402, which specifically dealt with commitment of inmates, required a predeprivation hearing. Id. at 451. The court noted, finally, that:

> [I]t is not irrelevant that the plaintiffs here have advanced competent evidence from which a jury could conclude that the decision to deprive SVP detainees of a predeprivation hearing by replacing the procedures of directly applicable Correction Law § 402 with those of seemingly inapplicable MHL § 9.27 was a deliberate decision taken for political reasons. To deprive plaintiffs of their constitutional rights for political gain can never be reasonable.

Id. at 451-52.

The defendants appeal.

## DISCUSSION

We review de novo a district court's denial of summary judgment on qualified immunity grounds, and construe all evidence and draw all reasonable inferences in the non-moving party's favor. Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

### I. Procedural Due Process Claim

The plaintiffs allege that they were denied their Fourteenth Amendment right to procedural due process when they were committed to a psychiatric institution without the benefit

of notice, psychiatric examination by court-appointed physicians, or a judicial hearing prior to their commitment. In order to state a claim under 42 U.S.C. § 1983 for denial of procedural due process in the context of this litigation, the plaintiffs are required to demonstrate that they have a protected liberty interest in not being involuntarily committed to a psychiatric institution and that they were deprived of that interest without due process of law. See Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir. 2000).

On appeal, the defendants urge that the district court erred in reading Vitek v. Jones, 445 U.S. 480 (1980), as mandating especially stringent due process procedures for prisoners, arguing that while notice and a hearing are generally required, nothing in Vitek prohibits brief periods of prehearing commitment if a timely hearing is later offered. The defendants insist that courts have upheld identical prehearing commitments of prisoners that the district court concluded did not satisfy due process here, and that in any event the procedures employed did indeed comply with due process requirements. The district court looked to the Supreme Court's decision in Vitek in determining what procedural protections are required before an inmate can be civilly committed without his consent consistent with due process standards. Bailey, 722 F. Supp. 2d at 447-48. The court read Vitek to require notice, a predeprivation adversarial hearing, and a written statement by the decision

18

maker disclosing the reasons for the inmate's commitment. Id. at 448.

Vitek addressed an as-applied challenge to the constitutionality of a Nebraska statute that provided for the transfer of an inmate to a psychiatric facility at the direction of the State's Director of Correctional Services if a psychologist or psychiatrist concluded that the prisoner "'suffers from a mental disease or defect'" that the prisoner's current facility could not properly treat. Vitek, 445 U.S. at 483. Such a transfer remained valid until the expiration of the prisoner's sentence, at which point civil commitment proceedings were required prior to continued confinement. Id. at 483-84.

The plaintiff in Vitek was an inmate who had been transferred to a psychiatric facility after setting his mattress on fire while in solitary confinement. Id. at 484. The Vitek Court considered whether the transfer of a prisoner to a state mental hospital implicated a liberty interest triggering due process protection, and concluded that the plaintiff's "objective expectation" based on state law and practice that he would not be transferred to a mental hospital if his condition could be treated in prison did create a liberty interest requiring "appropriate procedures" prior to its deprivation. Id. at 489-90. The Court emphasized the "stigmatizing consequences of a transfer to a mental hospital" and the "mandatory behavior modification" treatment the prisoner would undergo once at that hospital. Id. at 494.

19

The district court in <u>Vitek</u> identified seven safeguards it concluded were required to protect the plaintiff's liberty interest. Among them were pretransfer notice to the prisoner, a pretransfer hearing at which the prisoner could present and cross-examine witnesses, and the right to counsel. <u>See</u> <u>id.</u> at 494-95.

In considering these requirements, the Supreme Court explained that while the State has a substantial interest in "segregating and treating mentally ill patients," "[t]he interest of the prisoner in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful," and the "risk of error . . . is substantial enough to warrant appropriate procedural safeguards against error." <u>Id.</u> at 495. The Court acknowledged that the inquiry into whether a prisoner should be placed in a psychiatric facility is "essentially medical," but concluded that "[t]he medical nature of the inquiry . . . does not justify dispensing with due process requirements. It is precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings." <u>Id.</u> (quotation marks and citation omitted). The Court concluded that the procedures prescribed by the district court were "appropriate in the circumstances present . . . ." <u>Id.</u> at 496.[5]

---

[5] The requirement of legal counsel was endorsed by only a plurality of the court. Justice Powell wrote in a concurrence that although "qualified and independent assistance" must be provided, it need not take the form of a "licensed attorney." <u>Vitek</u>, 445 U.S. at 497 (Powell, J., concurring).

*Vitek* is plainly relevant to this case. It confirms the plaintiffs' contention that a prisoner has a liberty interest in the essential nature of his confinement, and that this interest must be safeguarded with appropriate procedures. But it does not automatically follow from the *Vitek* Court's endorsement of the procedures mandated by the district court in that case that the same process is required in every case. See *id.* (concluding that the procedures set forth by the district court were "appropriate *in the circumstances present here*." (emphasis added)). The Court's acknowledgment that it is "precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings," *id.* at 495, similarly stops short of identifying the circumstances in which an adversary hearing must be held or what that hearing should entail.

Indeed, the facts and legal posture of *Vitek* differ significantly from those before us. The plaintiff in *Vitek* faced confinement in a psychiatric institution for the duration of his prison sentence based on the opinion of a single doctor, with no opportunity for an additional hearing. The procedures at issue in *Vitek*, therefore, provided fewer safeguards than were offered to the plaintiffs here. And because the *Vitek* Court never discussed whether the availability of a postdeprivation hearing negates the need for a predeprivation hearing, its applicability to this case is limited.

The Supreme Court's decision in *Zinermon v. Burch*, 494 U.S. 113 (1990), however, does offer guidance as to when a

21

postdeprivation hearing would survive constitutional scrutiny. There, the Court considered the case of a patient admitted to a state mental health hospital after completing voluntary admission forms. The patient later alleged that he was a paranoid schizophrenic and had been unable to give informed consent to his admission. The defendants, he asserted, should have afforded him the procedural safeguards required for involuntary commitment, including a hearing. Id. at 123-24.

Quoting Mathews v. Eldrige, 424 U.S. 319, 335 (1976), the Court described the factors to be considered in determining what procedural protections are necessary in a particular case:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Zinermon, 494 U.S. at 127.

The Zinermon Court observed that, applying the Mathews test, it "usually has held that the Constitution requires some kind of hearing before the State deprives a person of liberty or property." Id. (emphasis in original). But, the Court continued, a postdeprivation hearing might satisfy due process where a predeprivation hearing is "unduly burdensome in proportion to the liberty interest at stake" or "where the State is truly unable to anticipate and prevent a random deprivation of

22

a liberty interest." Id. at 132. "[W]here the State feasibly can provide a predeprivation hearing," however, "it generally must do so regardless of the adequacy of a postdeprivation . . . remedy." Id.

The Court concluded that the defendants could be liable to the plaintiff under his section 1983 claim for deprivation of his procedural due process rights because it was foreseeable that a mentally ill patient incompetent to give informed consent would nonetheless sign a voluntary admission form and because the Court could not "say that predeprivation process was impossible" under the circumstances. Id. at 136-37.

The deprivation here seems to us to have been as foreseeable as it was in Zinermon. As in that case, the deprivation here occurred at a "predictable point," see id. at 136 -- the expiration of the inmate's sentence. Nothing that occurred here was random or unanticipated so as to prevent the State from planning for and then providing predeprivation process. Nor, as we discuss below, can it reasonably be argued that predeprivation procedural protections were "unduly burdensome" in comparison with the substantial liberty interest at stake.

Application of the Mathews balancing test supports the conclusion that predeprivation process was required here and that postdeprivation remedies were constitutionally insufficient. See Mathews, 424 U.S. at 334-35. With respect to the "private interest" aspect of the standard, the defendants acknowledge that

23

"involuntary commitment is a significant curtailment of liberty," but argue that because of the "extremely brief" period of potential prehearing commitment, the safeguards required are not as significant as they would otherwise be. Appellants' Br. 30. We think there can be no serious doubt that the liberty interests implicated here are of a high order. Not only were the plaintiffs' physical freedoms curtailed, but they were also subject to specialized mental health treatment. This treatment included the use of a "penile plethysmograph," which the First Circuit has explained is a "strain gauge strapped to an individual's genitals while sexually explicit pictures are displayed in an effort to determine his sexual arousal patterns." Harrington v. Almy, 977 F.2d 37, 44 (1st Cir. 1992). One can imagine that to be something less than a dignity inspiring experience.

Classification as an SVP also constitutes a fundamental change in an inmate's status and privileges. An SVP committed to a psychiatric hospital cannot gain release until he has secured either employment or vocational training, despite the fact that any potential employer must be notified of his SVP status. An SVP also suffers the stigma of the label itself, which connotes a likelihood of recidivist sexually violent behavior, and of a diagnosis of mental illness. And although it may be true that SVPs have already been convicted of sex offenses carrying significant stigma, that the additional stigma is only incremental does not render it illusory.

As Vitek confirmed, a prisoner -- even one convicted of an atrocious crime -- maintains a liberty interest in the conditions relating to the essential nature of his confinement. Here, not only did those committed pursuant to the SVP Initiative face a material change in the nature of their confinement, but their confinement was also prolonged.

With regard to the second factor in the Mathews test -- "risk of an erroneous deprivation of such interest through the procedures used," Zinermon, 494 U.S. at 127 -- the defendants insist that the risk of such an erroneous deprivation during the five-day period before a committed SVP is entitled to a hearing is "slight" because of the safeguards provided in Article 9. Appellants' Br. 30. The defendants' argument is not without force. There were, on paper, procedures intended to mitigate the risk of an erroneous deprivation. For example, three separate medical professionals were required to sign off on every commitment. And, as the defendants point out, fewer than 20 percent of those evaluated under the SVP Initiative were ultimately committed.

Despite these safeguards, several factors increased the risk that an inmate would be erroneously committed under the Initiative. The OMH physicians charged with examining the prisoners were unfamiliar with the standards for assessing sex offenders and the likelihood of recidivism, and were evaluating them using a novel standard and new tools, such as the Static 99 form, with which they had no experience.

25

Although it may be dangerous to overstate the importance of the fact that the Initiative was quickly put into place in a politically charged environment, it is difficult to ignore (as the district court did not). Because of the infancy of the Initiative and the lack of training or formal procedures, coupled with significant political pressure, the risk of error seems to us to have been enhanced. See Rodriquez v. City of New York, 72 F.3d 1051, 1062 (2d Cir. 1995) ("Though we agree with the district court that due process does not require a guarantee that a physician's assessment of the likelihood of serious harm be correct, . . . due process does demand that the decision to order an involuntary emergency commitment be made in accordance with a standard that promises some reasonable degree of accuracy."). Additional safeguards would unquestionably have lessened this risk. If the plaintiffs were afforded notice and a hearing prior to their commitments, the decision as to whether to commit would have been undertaken by a neutral decisionmaker with the benefit of an adversarial hearing.

The defendants argue that the availability of a postdeprivation hearing mitigated the risk of erroneous deprivation. They point out that none of the plaintiffs requested a hearing following his commitment. Although this is true, the plaintiffs' filing of a habeas corpus petition in New York State court and Bailey's allegation that he did not know that he could request such a hearing, suggest that the

26

availability and contours of the process likely were not clear to the plaintiffs.[6]

With respect to the third part of the Mathews test -- the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, Zinermon, 494 U.S. at 127 -- the defendants urge that predeprivation hearings would have imposed a substantial burden on the State.  They note that during the first month of the Initiative, eighty prisoners were examined, twenty-one of whom were eventually committed, and that many of these prisoners were on the verge of being released. Because the SVP Initiative had begun only weeks before some of the plaintiffs were scheduled for release, the defendants contend, predeprivation hearings, in addition to conducting psychiatric evaluations, would have diverted scarce resources from the treatment of mentally ill inmates.

We disagree.  Under the provisions of Article 9, the defendants should have been prepared to present their case for civil commitment at a hearing on five-days notice at any point after a civil commitment was effected.  It does not follow that they could not have prepared for such a hearing in advance of commitment without incurring substantial additional expense or effort.  The sole reason that holding predeprivation hearings

_____

[6]    The record otherwise contains little detail about what the plaintiffs understood regarding the availability of postdeprivation hearings.

27

would have unduly burdened the State is that a decision was made to create and implement the Initiative on a compressed timeline; any exceptional burden that the State faced was of its own making.  We do not think this fact should work in the defendants' favor -- if it did, due process requirements could be curtailed by delaying the establishment of proper procedures until they became "too burdensome."

Construing the evidence in the light most favorable to the plaintiffs, the facts alleged, if proven, would establish that the defendants violated the plaintiffs' rights to procedural due process.  Even if it may be said that the district court mischaracterized <u>Vitek</u>'s dicta as holding, we find no support for the defendants' contention that a predeprivation hearing was not required in the absence of emergent circumstances.  The <u>Mathews</u> test brings the defendants' violation into sharp relief: the private interest at stake was significant; the risk of erroneous deprivation was pronounced due to the lack of notice or an adversary proceeding, the politically charged environment, and the novel aspects of this initiative, and that risk would have been reduced by additional procedures; and the burden to the State would have been no greater predeprivation than postdeprivation were it not for the State's own actions in scrambling to implement the Initiative.

## II.  Qualified Immunity

The defendants are entitled to qualified immunity if they can establish either that (1) "a constitutional right was [not] violated" or (2) "the right was [not] clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).[7]  As a part of this inquiry, the Court considers whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[8]  Id. at 202.

---

[7]  This was the test applied by the district court:  The "defendants are entitled to qualified immunity if they show either that plaintiffs have failed to make out a violation of constitutional right or if the right at issue was not clearly established at the time of the alleged violation."  Bailey, 722 F. Supp. 2d at 449.

[8]  There is some tension in our Circuit's cases as to whether the qualified immunity standard is of two or three parts, and whether the "reasonable officer" inquiry is part of step two -- the "clearly established" prong -- or whether it is a separate, third step in the analysis.  Compare, e.g., Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 433 (2d Cir. 2009)(reciting two-part test and stating that "'[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted'" (quoting Saucier, 533 U.S. at 202)), with X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999)(a governmental official is entitled to qualified immunity "in any of three circumstances": (1) if the charged conduct does not violate a constitutional right; (2) if the constitutional right "was not clearly established at the time of the conduct"; or (3) "if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken" (quotation marks, brackets, and ellipses omitted)); Taravella v. Town of Wolcott, 599 F.3d 129, 133-34 (2d Cir. 2010)(describing qualified immunity analysis as "a two-part inquiry" but adding that "the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful").

29

Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment. See In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996). We have already determined that there is sufficient evidence in the record to support, as a matter of law, the plaintiffs' procedural due process claims. We therefore turn to the question of whether the right at issue was clearly established. In answering that question, we look to whether (1) the right was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful. Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004). We have further held that where the law was established in three other circuits and the decisions of our own Court foreshadowed the right, the law was sufficiently "well established" that its violation stripped the defendant of his immunity. Varrone v. Bilotti, 123 F.3d 75, 78-79 (2d Cir. 1997).

For a right to be clearly established, it is not necessary that courts have agreed "upon the precise formulation of the standard." Saucier, 533 U.S. at 202. "Assuming, for instance, that various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a

---

This is not a debate we need enter inasmuch as we conclude that qualified immunity is not available to the defendants irrespective of which way the test is articulated.

30

fair way from the facts presented in the case at hand, the [defendants] would not be entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard." Id. at 202-03.

The Supreme Court stated more than twenty years ago in Zinermon that "where the State feasibly can provide a predeprivation hearing . . . it generally must do so regardless of the adequacy of a postdeprivation . . . remedy . . . ." Zinermon, 494 U.S. at 132. Unless a predeprivation hearing is "unduly burdensome in proportion to the liberty interest at stake" or "the State is truly unable to anticipate and prevent a random deprivation of a liberty interest," predeprivation notice and a hearing are required before an individual may be deprived of a significant liberty interest. Id.

The defendants raise several arguments in support of their position that the right at issue here -- notice and an adversarial hearing prior to civil commitment -- was not so clearly established that a reasonable person in the defendants' position would know that his conduct was unlawful. The defendants contend that the Second Circuit upheld the procedures laid out in Article 9 in Project Release v. Prevost, 722 F.2d 960 (2d Cir. 1983), which examined the constitutionality of Article 9's provision allowing hospitalization for up to sixty days without a hearing unless one is requested. Project Release dealt, however, with the facial validity of Article 9, and explicitly left open the possibility of an as-applied challenge.

31

*Id.* at 971.  The plaintiffs do not contend that Article 9 is unconstitutional when utilized to take an acutely dangerous and mentally ill person off the streets -- the basis upon which we upheld the statute in *Project Release*.

In that decision, we concluded that involuntary commitment without an automatic hearing within 48 hours was constitutional when dealing with "persons with a mental illness 'for which care and treatment in a hospital is essential to such persons' welfare and whose judgment is so impaired that [they are] unable to understand the need for such treatment.'"  *Id.* at 972 (quoting MHL §§ 9.27, 9.01).  That is not the population at issue here, nor the standard that was applied.

The defendants also point out that the New York Appellate Division "found no constitutional violation in plaintiffs' own cases when plaintiffs raised the identical due process claim on state habeas review."  Appellants' Br. 37. (emphasis omitted).  The defendants refer to *State* ex rel. *Harkavy v. Consilvio*, 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006), but that decision was reversed by the New York Court of Appeals, *see State* ex rel. *Harkavy v. Consilvio*, 7 N.Y.3d 607, 859 N.E.2d 508, 825 N.Y.S.2d 702 (2006).  And although the Court of Appeals in *Harkavy* did not decide the constitutionality of applying Article 9 to prisoners, in a concurrence, as we have seen, Judge Smith noted that it "would raise serious constitutional problems," because the plaintiffs had all been in prison for several years before civil commitment procedures were

32

initiated and there was no "sudden, unforseen emergency" that would require their immediate commitment without prior notice or a hearing. Id. at 615 (Smith, J., concurring).

The defendants cite several cases in which they contend that prehearing transfer and commitment of prisoners and sex offenders has been held to be constitutional. In Gay v. Turner, 994 F.2d 425 (8th Cir. 1993) (per curiam), for example, the Eighth Circuit affirmed a grant of summary judgment for a defendant on the plaintiff's due process claim where the plaintiff, an inmate, had been transferred to a state mental hospital without a hearing. Id. at 426. That decision, however, was based on the plaintiff having signed transfer forms, and her failure to adduce any evidence that her consent was not voluntary. Id. at 427.

The defendants also rely on Aruanno v. Hayman, 384 F. App'x 144 (3d Cir.), cert. denied, 131 S.Ct. 835 (2010), in which the Third Circuit -- in a non-precedential opinion -- upheld a state-law provision allowing a court to order temporary commitment based on an ex parte submission from the State Attorney General. Id. at 150. Any individual committed under the statute was entitled to a hearing within twenty days of the commitment order. Id.

The factual circumstances in Aruanno differ significantly from those here. New Jersey had initiated civil commitment proceedings nearly a year before the plaintiff's release date, but was unable to hold a hearing due in part to the

33

plaintiff's "repeated insistence that he be appointed new counsel." Id. at 145. In addition, Aruanno was temporarily committed pursuant to a judicial order, albeit one based on an ex parte submission. Id. at 148 n.8. Aruanno suffered from schizophrenia and refused to take his medication, which a doctor later testified presented a "very high" risk of future violence. Id. at 146. The non-precedential opinion was issued, moreover, over Judge McKee's dissent, which argued that "absent exigent circumstances, no justification exists for denying [the plaintiff] his due process right to notice prior to his involuntary commitment under the [act]." Id. at 152-53. He continued, "[i]t is clear that post-deprivation hearings are appropriate and constitutionally permissible in emergency situations where there is no realistic opportunity to afford prior notice to one whom the state wants to involuntarily commit. That is simply not the situation here . . . ." Id. at 153. We agree.

The defendants also point to the procedures in the federal sex-offender commitment statute, 18 U.S.C. § 4248. Under that statute, the Department of Justice must certify to a federal district court that a prisoner is "sexually dangerous," at which point the statute "stays the individual's release from prison . . . giving the Government an opportunity to prove its claims at a hearing." United States v. Comstock, 130 S.Ct. 1949, 1954 (2010). The prisoner is then afforded counsel and an adversarial hearing prior to his civil commitment. Id.

34

According to the defendants, the procedures set forth in Article 9 are _more_ protective than are those in the federal statute because the latter permits the individual's release to be stayed for up to seventy-five days or more before his commitment hearing. <u>See</u> 18 U.S.C. § 4247(b); <u>see also</u> <u>United States v. Shields</u>, 522 F. Supp. 2d 317, 334 (D. Mass. 2007).[9] What the defendants fail to acknowledge, however, is that the federal statute permits a temporary stay of release prior to a commitment hearing; it does not permit, as was the case here, civil commitment followed by the opportunity for a hearing. Here, the question is whether an individual must be afforded the opportunity for a hearing _before_ he is civilly committed to a psychiatric facility. <u>Vitek</u>'s emphasis on the "stigmatizing consequences of transfer to a mental hospital" and the "mandatory behavior modification" treatment that prisoners undergo once at the hospital, <u>Vitek</u>, 445 U.S. at 494, suggests there is an important difference between holding an inmate for a brief period beyond his release date for the purpose of providing process before civil commitment and subjecting him to commitment in a psychiatric facility in advance of any hearing.

---

[9] In <u>Shields</u>, the district court declined to invalidate the federal sex-offender statute on a facial due process challenge. The court did, however, find that the lack of a probable cause hearing after certification "raises serious constitutional questions." <u>Shields</u>, 522 F. Supp. 2d at 333. The court concluded that, in order to avoid interpreting the act itself as unconstitutional, it would construe it to require a hearing "within forty-eight hours after a certified individual is detained beyond his scheduled release date," unless there were "exigent or extraordinary circumstances." <u>Id.</u> at 337.

We ultimately agree with the district court that "the basic proposition that due process requires a predeprivation hearing unless there is an immediate danger to society" was well established prior to 2005. Bailey, 722 F. Supp. 2d at 451. Despite the litany of cases cited by the defendants to suggest that due process tolerates civil commitment of inmates without either notice or a hearing, each of those cases involved critical factors not present here. In none of the cases was a civil commitment effected without notice or a predeprivation hearing where the inmate was safely confined, and, indeed, where the standard the inmate met was not one of immediate and acute dangerousness but rather potential recidivism five, ten, or fifteen years after his release. See, e.g. Glass v. Mayas, 984 F.2d 55, 57 (2d Cir. 1993) (upholding involuntary commitment without a predeprivation hearing where the committed individual "was hospitalized following two reports he was threatening an individual with a gun," had displayed behavior described by those who examined him as "hostile, guarded, angry, suspicious, uncooperative, and paranoid," and "had an extensive psychiatric history, which included a history of violent behavior"). The defendants offer no Supreme Court or Second Circuit precedent for the proposition that due process is satisfied if an individual in the plaintiffs' position has the opportunity to request a hearing after he has been labeled an SVP and civilly committed.

Except for emergent or otherwise unusual circumstances, such as where an emergency makes it necessary for the State to

36

act immediately to avoid imminent harm to the person being restrained or to the public, or where predeprivation process is highly impracticable, the Supreme Court has long held that "the Constitution requires some kind of a hearing <u>before</u> the State deprives a person of liberty." <u>Zinermon</u>, 494 U.S. at 127 (emphasis in original). <u>See also</u> <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 62 (1993) ("Unless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property . . . ."); <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." (quotation marks and citation omitted)); <u>Vitek</u>, 445 U.S. at 496 ("[N]otice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him."); <u>Burtnieks v. City of New York</u>, 716 F.2d 982, 988 (2d Cir. 1983) (observing that "the existence <u>vel non</u> of an emergency . . . is a material fact" in determining whether a predeprivation hearing is constitutionally required).

Furthermore, the decision to apply the procedures of Article 9 to the plaintiffs was made despite the fact that there was a law in place, Correction Law § 402, which outlined civil commitment procedures for those already incarcerated and which clearly provided for a predeprivation hearing. We think

37

reasonable persons in the defendants' positions would have understood that, absent exigent circumstances not present here, it was unconstitutional to civilly commit inmates to a psychiatric facility prior to any notice or adversarial hearing. Using the words of the district court, in the absence of any "immediate danger to society," a predeprivation hearing was required before civilly committing an inmate and this requirement was "so obvious that no reasonable defendant official could have failed to miss it." Bailey, 722 F. Supp. 2d at 450. The defendants are therefore not entitled to the benefit of qualified immunity.

### III. Plaintiffs' Additional Claims

The defendants, citing Sadallah v. City of Utica, 383 F.3d 34 (2d Cir. 2004), argue that because they are entitled to qualified immunity on the plaintiffs' procedural due process claims, the defendants are also entitled to summary judgment on the plaintiffs' remaining federal and state claims. The court in Sadallah explained that "[n]ormally, we would not have jurisdiction to consider plaintiffs' [additional] claims . . . because only the issue of . . . entitlement to qualified immunity was immediately appealable. When, however, an appellate court 'has taken jurisdiction over one issue in a case, it may, in its discretion, exercise jurisdiction over an independent but related question that is inextricably intertwined with the [appealable issue] or is necessary to ensure meaningful review of that issue.'" Id. at 39 (quoting Ierardi v. Sisco, 119 F.3d 183, 189

38

(2d Cir. 1997)). Specifically, the defendants urge that because the gist of the plaintiffs' other claims is the existence of a deliberate conspiracy to violate the plaintiffs' rights, those claims must fail because the right at issue was not clearly established.

We decline to exercise jurisdiction over the plaintiffs' other claims. Reaching these additional claims is not necessary to ensure meaningful review of the qualified immunity question, nor are the claims "inextricably intertwined" with that issue. Furthermore, as a practical matter, because we conclude that qualified immunity does not attach to the procedural due process claims, there would be no basis for dismissing the other claims against the defendants.

**IV. Plaintiffs' Summary Judgment Motion**

Finally, the plaintiffs assert that the district court erred in not granting summary judgment in their favor on their procedural due process claims after determining that the defendants were not entitled to qualified immunity, and, in a later opinion, that each defendant participated in the constitutional deprivation.

The plaintiffs mischaracterize the district court's opinion. The court concluded that the plaintiffs had adduced enough evidence of personal involvement to survive summary judgment -- not that "the defendants did not dispute their 'participat[ion] in the creation and implementation' of the SVP initiative." Appellees' Br. at 60. The district court noted

39

that the defendants "dispute the extent and materiality of such involvement" and determined that the question must go to the jury. Bailey, 2010 WL 4237071, at *4, 2010 U.S. Dist. LEXIS 113766, at *12. The factual disputes that the district court identified as precluding summary judgment have not been resolved, and we think it impossible for us to do so on the current record. Neither is this a question "inextricably intertwined" with the resolution of the qualified immunity issue.

## CONCLUSION

We have considered all of the parties' arguments, and for the reasons set forth above, we affirm the decision of the district court.