UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: June 5, 2015    Decided: May 17, 2016)

Docket No. 13-3412

————————————

ROBERT WARREN, CHARLES BROOKS,
Consolidated Plaintiffs-Appellants,

ROBERT TROCCHIO, SYLVIA TORRES, AS ADMINISTRATRIX OF THE
ESTATE OF JORGE BURGOS, JR., LOUIS MASSEI,
Consolidated Plaintiffs,

KENNETH BAILEY,
Plaintiff,

v.

GEORGE PATAKI, FORMER GOVERNOR OF NEW YORK STATE, SHARON
CARPINELLO, GLENN S. GOORD, EILEEN CONSILVIO, FORMER
EXECUTIVE DIRECTOR, MANHATTAN PSYCHIATRIC CENTER AND KIRBY
FORENSIC PSYCHIATRIC CENTER, ROBERT DENNISON, FORMER
CHAIRMAN OF THE NEW YORK STATE BOARD OF PAROLE AND CHIEF
EXECUTIVE OFFICER OF THE NEW YORK STATE DIVISION OF PAROLE,
DALE ARTUS, FORMER SUPERINTENDENT OF CLINTON CORRECTIONAL
FACILITY,
Defendants-Appellees,

JOHN DOE(S), # 3, SUPERINTENDENT OF WYOMING CORRECTIONAL
FACILITY, JOHN DOE(S), # 4, SUPERINTENDENT OF ATTICA
CORRECTIONAL FACILITY, JOHN DOE(S), # 5, SUPERINTENDENT OF THE

DOWNSTATE CORRECTIONAL FACILITY, JOHN DOES, # 6 THROUGH 20, MEDICAL PERSONNEL WHO EXAMINED AND EVALUATED PLAINTIFF PURSUANT TO NEW YORK STATE MENTAL HYGIENE LAW ARTICLE 9, MICHAEL GIAMBRUNO, JAMES CONWAY, PAUL ANNETTS, EMILIA RUTIGLIANO, PRABHAKAR GUMBULA, OLUSEGUN BELLO, ALLAN WELLS, JONATHAN KAPLAN, MARY ANN ROSS, AYODEJI SOMEFUN, MICHAL KUNZ, WILLIAM POWERS, LEO E. PAYANT, LAWRENCE FARAGO, LUIS HERNANDEZ, SAMUEL LANGER, JEFFREY TEDFORD, FORMER DEPUTY SUPERINTENDENT OF SECURITY, CLINTON CORRECTIONAL FACILITY, WILLIAM J. SACKETT, FACILITY SENIOR PAROLE OFFICER, CLINTON CORRECTIONAL FACILITY, JEAN LIU, PSYCHIATRIST WHO EVALUATED PLAINTIFF FOR POSSIBLE CIVIL COMMITMENT, ABADUL QAYYUM, CHARLES CHUNG, Defendants.[*]

---

Before:    SACK, HALL, and CARNEY, *Circuit Judges*.

The plaintiffs were civilly committed to state psychiatric facilities pursuant to the New York State Sexually Violent Predator Initiative promulgated by the executive branch of the New York State government in 2005. Challenging their commitments by bringing suit in the United States District Court for the Southern District of New York, the plaintiffs asserted that the defendants, who were allegedly involved in the creation and execution of the Initiative, violated the plaintiffs' rights under the Fourth and Fourteenth Amendments of the U.S.

---

[*] We accept the parties' representations, made in response to our inquiry of counsel, that all named defendants were duly served with process in this litigation and thus are properly identified as defendants. The Clerk of Court is therefore respectfully directed to amend the official caption as shown above.

Constitution, and state law. The district court (Jed S. Rakoff, *Judge*) concluded, on defendants' motion for summary judgment, that the defendants were not entitled to qualified immunity as a matter of law, a conclusion that we affirmed on interlocutory appeal. Many of the claims were thereafter dismissed by the district court on judgments as a matter of law, while the remainder were tried to a jury. The jury found one defendant liable for procedural due-process violations, and awarded each plaintiff one dollar in nominal damages against that defendant. The appellants now challenge the district court's (1) jury instruction on personal involvement; (2) denial of judgment as a matter of law on procedural due-process liability; (3) denial of judgment as a matter of law on the plaintiffs' entitlement to actual, compensatory damages; (4) entry of judgment for the defendants on the plaintiffs' false-imprisonment claims on the grounds that these claims were duplicative; and (5) limitations on depositions, and several other evidentiary decisions. We affirm the judgment of the district court.

AFFIRMED.

> KAREN R. KING (Jesse S. Crew, Jayme J. Herschkopf, and Ekta R. Dharia, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for Consolidated Plaintiffs-Appellants*.

Ameer Benno, Benno & Associates P.C.,
New York, New York, *(on the brief)*, *for
Consolidated Plaintiffs-Appellants*.


CLAUDE S. PLATTON (Barbara D.
Underwood, Cecelia C. Chang, *on the brief*),
*for* Eric T. Schneiderman, Attorney General
of the State of New York, New York, New
York, *for Defendants-Appellees Except George
Pataki*.

ABBE DAVID LOWELL (Christopher D.
Man, *on the brief*), Chadbourne & Parke,
LLP, Washington, District of Columbia, *for
Defendant-Appellee George Pataki*.

SACK, *Circuit Judge*:

In 2005, then-New York State Governor George Pataki launched the Sexually Violent Predator Initiative (the "SVP Initiative" or the "Initiative"), which provided for the involuntary civil commitment at state psychiatric facilities of some "sexually violent predators" ("SVPs") nearing the date of their release from incarceration or supervision. The six plaintiffs in this case were civilly committed to a psychiatric hospital in late 2005, during the first weeks the Initiative was in effect. In 2008, they filed this action against several individuals who allegedly designed or implemented the Initiative, asserting claims under the Fourth Amendment, the substantive and procedural components of the

Fourteenth Amendment's Due Process Clause, the Fourteenth Amendment's

Equal Protection Clause, and several provisions of New York state law.

In *Bailey v. Pataki*, 708 F.3d 391 (2d Cir. 2013), we affirmed on interlocutory

appeal the decision of the district court (Jed S. Rakoff, *Judge*) in *Bailey v. Pataki*,

722 F. Supp. 2d 443 (S.D.N.Y. 2010). There, the district court had concluded that

the defendants could not establish as a matter of law at the summary judgment

stage that they were entitled to qualified immunity on the plaintiffs' procedural

due-process claims. In affirming, we concluded that if the material facts alleged

were proven, the Initiative would have violated the plaintiffs' clearly established

rights to procedural due process. *Bailey*, 708 F.3d at 403-04.

Following our decision, the district court held a jury trial on the plaintiffs'

false-imprisonment, procedural due-process, substantive due-process, and state

law claims against six defendants: former Governor George Pataki; former Office

of Mental Health Commissioner Sharon Carpinello; former Department of

Correctional Services Commissioner Glenn S. Goord; former Executive Director

of Manhattan Psychiatric Center Eileen Consilvio; former Superintendent of

Clinton Correctional Facility Dale Artus; and former Division of Parole head

Robert Dennison. During the trial, the district court entered judgments as a

matter of law pursuant to Federal Rule of Civil Procedure 50 in the defendants' favor on the false-imprisonment claims, among others, deeming them impermissibly duplicative of the procedural due-process claims. The court also denied the plaintiffs' motions for judgment as a matter of law on their procedural due-process claims and their entitlement to actual, compensatory damages for the alleged due-process violations. The jury ultimately rejected the plaintiffs' remaining substantive due-process claims, found defendant Carpinello liable for procedural due-process violations, and awarded each plaintiff one dollar in nominal damages against her.

Plaintiffs Robert Warren and Charles Brooks appeal, challenging the district court's (1) jury instruction on personal involvement; (2) denial of judgment as a matter of law on procedural due-process liability; (3) denial of judgment as a matter of law on the plaintiffs' entitlement to actual, compensatory damages; (4) entry of judgment for the defendants on the plaintiffs' false-imprisonment claims on the grounds that these claims were duplicative; and (5) limitations on depositions, and several other evidentiary decisions. The plaintiffs dispute neither the judgment against them on their substantive due-process claims nor the denial of their requests for punitive damages.

6

For the reasons set forth below, we conclude that the plaintiffs' arguments

lack merit.  We therefore affirm the judgment of the district court.

# BACKGROUND

*Factual Background*

We set forth the factual background underlying this appeal in some detail

in our opinion affirming on interlocutory appeal the district court's denial of

summary judgment for the defendants on the grounds of qualified immunity.

*See Bailey*, 708 F.3d at 393-99.  We rehearse it here only insofar as we think it

necessary to an understanding of our resolution of this appeal.

*The SVP Initiative*

In October 2005, then-New York State Governor George Pataki faced a

challenge:  He had tried and failed several times to persuade the State Assembly

to establish a program that would permit the civil commitment and confinement

of designated sex offenders in New York State.  Political pressure on the issue

was mounting in the wake of a widely publicized murder committed by a then-

recently paroled sex offender.  Unwilling to wait any longer, as we described in

*Bailey*, *id.* at 394, the Governor directed New York's Office of Mental Health

("OMH") and Department of Correctional Services ("DOCS")[1] to "push the envelope of the State's existing involuntary commitment law," *id.* The result was the SVP Initiative. Its principal theme was that every "sexually violent predator" in state prison should and would be evaluated for involuntary civil commitment before being released from incarceration.

Sharon Carpinello, the Commissioner of the New York State Office of Mental Health, with several others, developed an implementation plan for the SVP Initiative. She presented it to Governor Pataki's representatives in mid-September 2005. The Initiative provided for a commitment process based on the procedures set forth in New York Mental Hygiene Law ("MHL") § 9.27 *et seq.* ("Article 9"), instead of the more stringent criteria for commitment set forth in Correction Law § 402,[2] which the SVP Initiative's designers had also considered.

---

[1] DOCS is now known as the Department of Corrections and Community Supervision, and commonly referred to by the nearly identical acronym, "DOCCS."

[2] As we explained in *Bailey*:

> Section 9.27 of the Mental Hygiene Law ("MHL"), codified in Article 9 of the MHL and entitled "Involuntary admission on medical certification," allows the director of a hospital to accept any patient "alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians." MHL § 9.27(a). The director must also receive a sworn application explaining why the patient needs mental health treatment. *Id.* After the patient arrives

8

at the hospital, a member of the hospital's psychiatric staff is required to examine him and confirm that he should be admitted. MHL § 9.27(e). The law requires that the nearest relative of the patient, or any other person the patient has designated, be given notice of the involuntary admission within five days of admission. MHL § 9.29(b). Within sixty days of admission, the patient or a friend or relative can request a hearing on the involuntary admission, which is required to be held within five days of receipt by the hospital director of notice of the request. MHL § 9.31(a). If no hearing has been held or court order issued, or if the patient does not consent to the admission, the hospital director is required to seek a court order within sixty days of the patient's involuntary admission if the director wishes to pursue the matter. MHL § 9.33(a).

Correction Law § 402 is entitled "Commitment of mentally ill inmates." Under that law, if a staff physician at a prison informs the prison superintendent that an inmate is mentally ill, the superintendent asks a "judge of the county court or justice of the supreme court in the county" to appoint two physicians to examine the inmate. Correction Law § 402(1). If both physicians conclude that hospitalization is appropriate, they must produce certificates to that effect. *Id*. The superintendent is then required to apply to the court for a commitment order, and personally serve notice on the inmate and his or her closest relative or, if relatives are unknown or not within the state, "any known friend," five days prior to the commitment. Correction Law § 402(3). The Mental Hygiene Legal Services must then inform the inmate (or, in appropriate cases, others concerned with the inmate's welfare) of "the procedures for placement in a hospital and of the inmate's right to have a hearing, to have judicial review with a right to a jury trial, to be represented by counsel and to seek an independent medical opinion." *Id*. The inmate is entitled to request a hearing before a judge prior to any transfer to a psychiatric hospital. Correction Law § 402(5). The procedural protections in section 402 may

Under this process, before being released from prison, inmates who had been deemed "sexually violent predators" would be evaluated by two OMH psychiatrists, each of whom would render an opinion as to whether the inmate should be involuntarily committed to a state psychiatric facility. Before the evaluation, DOCS would provide OMH with criminal history reports for each inmate. OMH would use these reports to create editorialized descriptions of the inmate's criminal history and an assessment of their likelihood of recidivism. They would then provide these materials to the OMH psychiatrists. If the OMH psychiatrists recommended civil commitment, the inmate would be transferred to a psychiatric center and examined by a psychiatrist to confirm the diagnosis. Once admitted to the facility, the inmate would begin undergoing a specialized course of treatment.

OMH officials informed Governor Pataki's office that they needed four to six months to prepare for the implementation of the SVP Initiative, including training the psychiatrists responsible for examining the inmates. Governor Pataki nonetheless ordered that the SVP Initiative begin forthwith.

---

only be bypassed where admission to a hospital is sought on an emergency basis. Correction Law § 402(9).

708 F.3d at 394-95.

Thereafter, under Goord's direction, DOCS began identifying inmates to be evaluated for civil commitment by OMH psychiatrists. The pool of inmates was drawn from those who had committed a violent offense as defined by New York Penal Law § 70.02, and those who had committed a sex offense as defined by Penal Law § 130, as well as from another list of inmates who had committed felonies that had been, to some extent, sexually motivated. Any inmate who refused to appear for an evaluation was potentially subject to disciplinary action, and refusal could have constituted a parole violation.

The SVP Initiative was in effect only briefly. In 2006, after several inmates who were confined under the SVP Initiative sought habeas corpus relief in state courts, the New York Court of Appeals held that the SVP Initiative should proceed under Correction Law § 402 instead of MHL Article 9, and ordered that each civilly committed individual remaining in OMH custody be provided an immediate retention hearing. *State ex rel. Harkavy v. Consilvio*, 7 N.Y.3d 607, 614, 859 N.E.2d 508, 512, 825 N.Y.S.2d 702, 706 (2006). Then, in 2007, the New York State Legislature ended the SVP Initiative by enacting a comprehensive statutory scheme for the civil commitment of dangerous sex offenders nearing release from incarceration or supervision.

*The Defendants' Roles*

Each of the defendants played a unique role in the design and implementation of the SVP Initiative.

George Pataki was the Governor of New York State from 1995 to 2006. He authorized the SVP Initiative, made it the official policy of the State of New York, and tasked DOCS and OMH with developing a detailed plan for its implementation.

Sharon Carpinello was Commissioner of OMH at the time the SVP Initiative was in place. Her duties as Commissioner included establishing, developing, and coordinating OMH programs and procedures. She helped to develop OMH's plan for implementing the SVP Initiative, reviewed the plan, and approved it for submission to Governor Pataki. After Governor Pataki approved the plan, she ordered OMH to carry it out.

Glenn Goord was the Commissioner of DOCS during the implementation of the SVP Initiative. He was involved in the process of planning the SVP Initiative, and understood that it called for inmates to be committed without a prior hearing. Goord ordered DOCS to implement the SVP Initiative by selecting for examination inmates due to be released and, depending on the result of the

examination, arranging for their transportation to psychiatric hospitals for commitment.

Eileen Consilvio was Executive Director of Manhattan Psychiatric Center ("MPC") when the SVP Initiative was created.  She agreed to make the MPC available to receive inmates designated for involuntary civil commitment under the initiative.  Consilvio handled the logistics of Warren's and Brooks's civil commitment there.

Dale Artus was Superintendent of the Clinton Correctional Facility[3] ("Clinton"), where Warren was imprisoned and to where he was returned after he was civilly committed.  Warren allegedly filed complaints about his confinement with Artus, who did not respond to them.

At the time that the SVP Initiative became effective, Robert Dennison was the highest-ranking officer in the Division of Parole ("Parole").[4]  Warren alleges that when he was confined at Clinton, he wrote to Dennison complaining about his reconfinement despite his having been granted parole.  It is not clear from the

---

[3] The Clinton Correctional Facility may be better known by the name of the town in which it is located: Dannemora, New York.  *See* Village of Dannemora, http://www.villageofdannemora.com (last visited May 16, 2016).

[4] In 2011, the Division of Parole was merged with DOCS (which, as explained above, is now known as DOCCS).

record what if anything Dennison did to investigate or otherwise address the situation.

*Plaintiffs' Confinement*

Plaintiffs Robert Warren and Charles Brooks, both convicted sex offenders, were involuntarily committed at the MPC and Kirby Psychiatric Center pursuant to the SVP Initiative after they were scheduled to be released from prison. Their involuntary civil commitment was based entirely on the recommendations of OMH psychiatrists.

Robert Warren was serving a sentence for multiple crimes, including sexual abuse in the first degree, when he was approved for parole and scheduled to be conditionally released from prison on September 27, 2005, under the supervision of Parole. The day before his scheduled release, and without prior notice, two OMH psychiatrists evaluated Warren by conducting short interviews, one of which was done remotely by video, and completing with respect to each of them a so-called Certification of Examining Physician to Support an Application for Involuntary Admission form. On that basis, they determined that he required involuntary commitment in a psychiatric hospital. On the day of his scheduled release, he was transferred to a state psychiatric institution instead.

Less than two months later, Warren was again examined by a psychiatrist, but this time he was found not to require confinement. On October 23, 2005, he was discharged into the custody of Parole. He was never in fact released on parole, however, nor was he given a parole revocation hearing. Instead, he was returned to DOCS and housed at Clinton, where he remained until October 23, 2006—the latest possible expiration date for his original prison sentence.[5]

Charles Brooks had nearly completed serving his eight-year prison term for burglary and sexual abuse in the second degree when, on Friday, October 7, 2005, the last business day before his scheduled release, he was evaluated by two OMH staff psychiatrists, who determined that he required involuntary commitment in a psychiatric hospital. Brooks was then sent to the MPC, where he remained confined pursuant to Article 9 until May 2009, at which time he was

---

[5] Warren later challenged his reconfinement as part of a state habeas corpus petition. The county court that heard the petition deemed his reconfinement to be unlawful, but found the appropriate remedy to be "merely a judgment directing petitioner's re-release to parole supervision subject to appropriate conditions imposed b[y] parole authorities, including special conditions which must be satisfied prior to the petitioner's re-release," which in Warren's case encompassed an approved-residence special condition. *Warren v. Artus*, No. 06-15, at 7-8 (N.Y. Sup. Ct., Clinton Cty., July 5, 2006), reproduced at Joint Appendix filed on this Appeal ("J.A.") 1498-99. Warren was ultimately unable to obtain Parole's approval of a residence, and thus remained at Clinton until October 23, 2006.

committed under the statute that replaced the SVP Initiative, MHL §§ 10.06-.17

("Article 10").[6]

*Procedural History*

Brooks, Warren, and several other similarly situated persons filed actions in 2008 in the U.S. District Court for the Southern District of New York seeking compensatory damages for their involuntary civil commitment under the SVP Initiative. The plaintiffs alleged violations of their Fourth Amendment right against false imprisonment, their Fourteenth Amendment rights to equal protection and substantive and procedural due process, and several rights under state law. The actions were designated as related and consolidated for trial.

During discovery, the plaintiffs filed notices of depositions for all of the defendants named in the complaints. The district court informed the plaintiffs that they would be permitted to take the depositions of only four senior official defendants of their choice, however, and that each deposition could not exceed

---

[6] Brooks's confinement under Article 10 was the subject of separate litigation challenging Article 10's validity, whether the state had jurisdiction over Brooks as a consequence of his illegal commitment under Article 9, and the adequacy of Brooks's legal representation. The challenges were unsuccessful. *See Brooks v. State*, 120 A.D.3d 1577, 993 N.Y.S.2d 409 (4th Dep't 2014), *leave to appeal denied*, 25 N.Y.3d 901, 30 N.E.3d 164, 7 N.Y.S.3d 273 (2015); *Brooks v. Sawyer*, No. 9:11-CV-248 (N.D.N.Y. Dec. 16, 2013); *State v. C.B.*, 88 A.D.3d 599, 931 N.Y.S.2d 300 (1st Dep't 2011), *appeal dismissed and leave to appeal denied*, 18 N.Y.3d 905, 963 N.E.2d 790, 940 N.Y.S.2d 213 (2012).

two hours. The plaintiffs chose to, and did, take the depositions of Pataki,

Carpinello, Goord, and Consilvio.

On March 31, 2010, the parties filed cross-motions for summary judgment. The district court issued a "bottom line" order granting the defendants' motion in part on statute of limitations grounds, but denying it on the issues of qualified immunity and lack of personal involvement.[7] The court also denied the plaintiffs' motion in its entirety. The district court later issued two opinions and orders setting forth its reasoning for its summary judgment decisions, which we affirmed on interlocutory appeal. *See Bailey v. Pataki*, 708 F.3d 391 (2d Cir. 2013).

Back in the district court, both sides then filed motions *in limine* in preparation for trial. Three of those motions are relevant to this appeal. First, the plaintiffs moved to preclude the defendants from arguing that the plaintiffs suffered no injury because they would have been confined nonetheless had they received a constitutionally sufficient pre-deprivation hearing. Second, the plaintiffs moved to preclude evidence concerning their criminal histories, prison disciplinary records, and OMH records, or, in the alternative, to bifurcate the trial. Third, the plaintiffs moved to require the defendants to bear the burden of

---

[7] Warren's claim against defendant Paul Annetts was dismissed by the court for lack of his personal involvement in the events at issue.

disproving that plaintiffs had suffered compensable damages.  The district court denied the first two of these motions, and granted the third.

A jury trial was conducted between July 9 and July 31, 2013.  The parties called twenty-nine fact witnesses in all, but no expert witnesses.

During the trial, the district court entered several judgments as a matter of law in the defendants' favor pursuant to Rule 50: for Artus and Dennison on all claims, and for the other defendants on all state-law claims except for negligence claims against Carpinello and Consilvio.  The district court also entered judgment for the defendants on the false-imprisonment claims because it deemed them duplicative of the plaintiffs' procedural due-process claims.  The court reasoned that the jury would need to find a procedural due-process violation in order to find that the false imprisonment was not otherwise "privileged," and that the damages recoverable under both causes of action were the same.  J.A. 1293 (Trial Transcript ("Tr.") 2871:20-2874:14).

After the district court entered judgment for the defendants on the false-imprisonment claims, the plaintiffs moved for judgment as a matter of law on their procedural due-process claims, and noted for the record their view that judgment as a matter of law under Rule 50 would also be appropriate on the

false-imprisonment claims, whose dismissal they contested. The district court denied the motion.

Before the case was submitted to the jury, the plaintiffs withdrew their remaining negligence claims. As a result, the principal disputed issues sent to the jury were whether: (1) the plaintiffs had established violations of their substantive due-process rights; (2) each defendant proximately caused the procedural due-process violations at issue; and (3) the plaintiffs were entitled to compensatory or punitive damages, and if so, in what amount or amounts.

On July 26, 2013, the district court held a charging conference during which the parties discussed how to instruct the jury on the meaning of proximate causation in the context of a procedural due-process violation. To establish a section 1983 claim, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004). To proximately cause a procedural due-process violation, therefore, a defendant must be personally involved in the violation. A plaintiff may establish such personal involvement by making any one of five showings (the "*Colon* factors"):

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

In preparation for the charging conference, the plaintiffs requested a jury instruction on proximate causation that listed the five *Colon* factors and explained that each would be sufficient to establish a defendant's personal involvement. During the conference, the court proposed an alternative instruction that described the threshold for personal involvement more briefly, with language that tracked only the third *Colon* factor. The plaintiffs made no objection to the court's proposed instruction on the threshold requirement for finding personal involvement. *See* J.A. 1304 (Tr. 2915:21-2916:8).

The court subsequently delivered its proposed proximate causation instruction, with one modification not relevant here, to the jury. The court first explained that each defendant could be held liable for violating a plaintiff's procedural due-process rights if he or she took steps that "proximately caused

that plaintiff to be involuntarily committed under the sexually-violent predator initiative." J.A. 1350 (Tr. 3100:02-04). The court then addressed the threshold for personal involvement:

> If a given defendant played a material role, directly or indirectly, in creating or implementing, even in good faith, the aforementioned aspects of the sexually-violent predator initiative that were constitutionally defective, and that foreseeably would be applied to someone in a given plaintiff['s] position, that would be sufficient to establish that that defendant proximately caused the violation of that plaintiff['s] constitutional right to procedural due process.

J.A. 1350 (Tr. 3100:17-24).

On the issue of damages, the district court gave the following instruction:

> In addition to disputing plaintiffs' proof of damages in various respects, defendants also raise a special defense, namely, that even if the given plaintiff you are considering had been given full due process, he would still have been involuntarily committed, and so he did not suffer any actual injury. On this defense, it is the defendants who bear the burden of proving this defense by a preponderance of the credible evidence. If you find that, notwithstanding [] a defendant['s] liability on a given claim, the plaintiff who made that claim did not suffer any injury, you should then award damages of one dollar. These are called "nominal damages."

J.A. 1351 (Tr. 3102:20-3103:05).

On July 31, 2013, the jury reached its verdict. It rejected the plaintiffs' substantive due-process claims and found Carpinello alone liable for procedural due-process violations. It further found that the plaintiffs were not entitled to

compensatory damages or punitive damages, and awarded nominal damages of one dollar to each plaintiff.

On August 8, 2013, the plaintiffs renewed their motion for judgment as a matter of law pursuant to Rule 50(b), which the district court summarily denied. This appeal followed.

## DISCUSSION

I.     Standards of Review

*A.     Judgment as a Matter of Law*

We review the district court's decision to grant or deny a Rule 50 motion for judgment as a matter of law *de novo*.  *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).

*B.     Jury Instructions*

We review "a claim of error in jury instructions *de novo*, reversing only where appellant can show that, viewing the charge as a whole, there was a prejudicial error." *United States v. Tropeano*, 252 F.3d 653, 657-58 (2d Cir. 2001). "'An erroneous instruction requires a new trial unless the error is harmless' . . . [and a]n error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quoting *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 460

22

(2d Cir. 1999)). If an instruction improperly directs the jury on whether a party has satisfied its burden of proof, "it is not harmless error because it goes directly to the [merits of the] claim, and a new trial is warranted." *Id.* (quoting *LNC Invs., Inc.*, 173 F.3d at 462).

C.    *Discovery Rulings*

"We review a district court's discovery rulings for abuse of discretion." *Moll v. Telesector Res. Grp.*, 760 F.3d 198, 204 (2d Cir. 2014). "A district court has abused its discretion if it has (1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009) (internal quotation marks omitted).

D.    *Evidentiary Rulings*

We review the district court's evidentiary rulings for abuse of discretion. *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003). We "give district court judges wide latitude in determining whether evidence is admissible at trial." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 148 (2d Cir. 2001) (internal quotation marks omitted). Even if we conclude that the district court abused its discretion, however, "an erroneous evidentiary ruling warrants a new trial only when a

23

substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error." *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (internal quotation marks omitted).  We "will not grant a new trial if we find that the improperly admitted evidence was 'harmless—i.e., [that] the evidence was unimportant in relation to everything else the jury considered on the issue in question.'" *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (brackets in original) (quoting *United States v. Germosen*, 139 F.3d 120, 127 (2d Cir. 1998)).  "An error is harmless if we 'can conclude with fair assurance that the evidence did not substantially influence the jury.'" *Cameron*, 598 F.3d at 61 (quoting *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992)).  In civil cases, the burden falls on the appellant to show that the error was not harmless and that "it is likely that in some material respect the factfinder's judgment was swayed by the error." *Tesser v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 370 F.3d 314, 319 (2d Cir. 2004) (internal quotation marks omitted).

II.     Jury Instructions on Personal Involvement

The plaintiffs now argue, for the first time, that the district court made a prejudicial error in the portion of its proximate-causation instruction that described the standard for personal involvement.  The plaintiffs contend that the instruction improperly took into account only the third of the five *Colon* factors,

24

and that the district court improperly added the terms "material" and "foreseeably" to the third *Colon* factor, thereby increasing the plaintiffs' burden of proof. **Blue 33-36.** The plaintiffs waived these arguments by failing to object to the instruction at trial, and we accordingly affirm as to this issue. *See United States v. Bradley*, 812 F.2d 774, 778 (2d Cir.) (a "failure to object at trial" to a jury instruction "result[s] in a waiver of any claim of error on appeal"), *cert. denied*, 484 U.S. 832 (1987). The plaintiffs had previously requested a substantially different proximate-causation charge as to their procedural due-process claims, which included all five *Colon* factors. When the district court proposed its shorter alternative, however, the plaintiffs' counsel made no mention of *Colon* or the inclusion of the terms "material" or "foreseeably."[8] Instead, the plaintiffs' counsel objected only to the omission of the words "without counsel" from another portion of the instruction. After the district court agreed with this objection, the plaintiffs' counsel stated, "[a]nd that's all we had for that one." *See* J.A. 1304 (Tr. 2915:21-2916:8).

---

[8] The plaintiffs' counsel's failure to object to the inclusion of the terms "material" and "foreseeably" in the proximate-cause instruction was understandable, because the proximate-cause inquiry is focused on whether "the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct," *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998), and the district court's use of those terms was therefore apt.

25

We "will disregard the failure to object where there is plain error affecting substantial rights that goes to the very essence of the case, or where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing." *Anderson v. Branen*, 17 F.3d 552, 556-57 (2d Cir.) (citations omitted), *reh'g denied*, 27 F.3d 29 (2d Cir. 1994). Neither condition is met here. As to the former, a substantial right is not implicated if there is no likelihood that the error or defect affected the outcome of the case, *see, e.g.*, *Tesser*, 370 F.3d at 319, and there is no evidence in the record before us sufficient to establish that the plaintiffs could have demonstrated any of the other four *Colon* factors. As to the latter condition, when the plaintiffs' counsel requested an instruction as to all of the *Colon* categories early in the trial, the district court judge responded that he "agree[d] . . . we're going to have to spell this out in some detail in the final instructions.," J.A. 706 (Tr. 542:07-08). That hardly suggests that further objections would have been unavailing. Accordingly, the plaintiffs' arguments as to the personal-involvement instruction have been waived.

### III. Judgment as a Matter of Law on the Plaintiffs' Procedural Due-Process Claims

The district court properly granted judgment as a matter of law to Dennison and Artus pursuant to Rule 50(a). The district court also properly denied the plaintiffs' renewed judgment as a matter of law against Consilvio, Goord, and Pataki under Rule 50(b).

Judgment as a matter of law is appropriate "only if [the court] can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007) (emphasis removed and internal quotation marks omitted). A Rule 50 motion may only be granted if "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Ginder*, 752 F.3d at 574 (brackets in original) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011)).

The district court properly dismissed the action against Artus and Dennison pursuant to their Rule 50(a) motion. They were defendants only as to Warren's claim that he was improperly returned to prison rather than released on parole after he was found not to require further civil commitment. There was no evidence that either defendant was responsible—either directly or indirectly—for Warren's continued imprisonment. To be sure, Warren testified that he wrote to them to lodge complaints about his reconfinement, but that testimony was an insufficient basis for a reasonable juror to conclude that Artus and Dennison knew of Warren's plight, let alone had the ability or responsibility to do something about it.

The district court also correctly declined to hold as a matter of law that Consilvio, Goord, and Pataki were liable for violating the plaintiffs' procedural due-process rights. The evidence does not compel a finding that these defendants proximately caused the procedural due-process violations allegedly suffered by the plaintiffs. The evidence at trial established that Consilvio—who was the Executive Director of the MPC in 2005—was aware that the plaintiffs were being committed under Article 9, but only handled the logistics for civil confinement at the facility. She was not otherwise involved in planning or

28

carrying out the SVP Initiative. A reasonable juror would not have been compelled to conclude, based on this evidence, that Consilvio proximately caused any of the alleged violations of the plaintiffs' constitutional rights, given her mere logistical role in one of the intermediate steps of the civil commitment process.

The evidence at trial with respect to Goord established that while he was involved in the implementation of the SVP Initiative—by overseeing the sharing of information between DOCS and OMH about soon-to-be-released inmates and assisting with the transportation of inmates to psychiatric facilities—he played only a minor role in designing it. Although Goord participated in several planning meetings, this evidence, standing alone, was not so powerful that it would compel a reasonable juror to conclude that Goord proximately caused the relevant harm: the plaintiffs' confinement without notice or a pre-deprivation hearing.

Finally, a reasonable juror would not have been compelled to conclude that Pataki played a material role in creating, coordinating, or implementing the

specific aspects of the SVP Initiative that were constitutionally defective.[9]  Pataki

testified that he "directed [his] team to work with OMH and to work with

[DOCS] to put in place the program," J.A. 1071 (Tr. 1988:02-03), and that he "gave

a green light to go forward with the program," J.A. 1070 (Tr. 1987:04-05).  But

with respect to the degree of his knowledge and involvement, he testified:

> Before there was a court decision, I did not understand any of the specifics of the initiative other than that there were three medical professionals who had to evaluate and conclude that the inmates were mentally ill and posed an imminent threat to themselves or others, and that they were entitled to a hearing.  Beyond that, I didn't know any of the other details.  I didn't know what section of law was being used; I didn't know even what article of law was being used.  That was left to the professionals to determine.

J.A. 1073 (Tr. 1999:11-20).  He testified further that he "didn't know whether the

hearing was before or after the commitment." J.A. 1073-74 (Tr. 1999:25-2000:03).

Pataki had admitted earlier in the course of the litigation that he ordered

DOCS and OMH to use the MHL § 9.27 standard for evaluating individuals

under the SVP Initiative and to follow the procedures laid out in Article 9.  The

district court cautioned the jury, however, that none of these admissions

---

[9] In *Bailey*, we explained that the SVP Initiative's use of the procedures set forth in Article 9 did not provide for adequate due process protections, because "absent exigent circumstances . . . it was unconstitutional to civilly commit inmates to a psychiatric facility prior to any notice or adversarial hearing."  708 F.3d at 408.

"necessarily mean[t] that he personally ordered that." J.A. 1087-88 (Tr. 2055:22-2056:01). In light of this evidence, and accepting Pataki's testimony as credible, a reasonable juror would not have been compelled to conclude that Pataki played a material role in creating, coordinating, or implementing the defective aspects of the SVP Initiative.

In sum, the district court did not err in granting the defendants' Rule 50(a) motion for judgment as a matter of law as to Artus and Dennison or in denying the plaintiffs' Rule 50(b) renewed motion for judgment as a matter of law against Consilvio, Goord, and Pataki.

IV.    Actual Damages

The plaintiffs argue that the district court erred in denying them judgment as a matter of law as to whether the defendants' alleged due-process violations caused the plaintiffs' injuries, and therefore whether they were entitled to actual damages instead of only nominal damages. The defendants counter that the district court improperly shifted the burden of proof on this issue to them. We conclude that the district court did not err in denying judgment as a matter of law to the plaintiffs on the causation question and submitting it to the jury. Because the defendants shouldered the burden of proof on this issue, we need

not reach their arguments as to whether the district court's decision to shift this burden to them was permissible.

It is well-settled that "[a]bsent a showing of causation [of the plaintiffs' injuries by the defendants' unconstitutional acts] and actual injury, a plaintiff is entitled only to nominal damages." *Miner*, 999 F.2d at 660 (citing *Carey v. Piphus*, 435 U.S. 247, 263, 266-67 (1978); *Patterson*, 905 F.2d at 568). At trial, the defendants asserted what the parties term a "no harm, no foul" defense[10]—they argued, in essence, that even if the plaintiffs had been provided constitutionally adequate pre-confinement process they would nonetheless have been committed. The plaintiffs argue that the district court erred in denying them judgment as a matter of law on this issue, and that because the defendants did not call any expert witnesses to opine on what might have happened in a hypothetical pre-deprivation hearing in 2005, the defendants could not satisfy their burden of proof. The plaintiffs further assert that the jury would have to engage in

---

[10] We reject the plaintiffs' argument that the defendants waived their "no harm, no foul" defense because they failed to plead it as an affirmative defense. Causation is a requirement for establishing a viable section 1983 procedural due-process claim, not an affirmative defense that must be raised in the pleadings. And in any event, the defendants' failure to plead this defense was excusable because it was not clear at the outset that they would bear the initial burden on this issue, as the district court correctly recognized. *See* J.A. 555-56 (Tr. 60:22-61:03).

impermissible speculation in order to resolve this question. We disagree. There was sufficient evidence before the jury to support a finding that Warren and Brooks would have been committed even if they had received due process, and therefore that the defendants had carried their burden on this issue.

The plaintiffs were constitutionally entitled only to "notice and an adversarial hearing prior to civil commitment." *Bailey*, 708 F.3d at 405. Principles of due process did not require the defendants to provide the plaintiffs with a hearing conducted pursuant to Correction Law § 402, nor were they constitutionally entitled to call a physician, psychiatrist, or expert witnesses favorable to them, no matter that their ability to call such witnesses might have rendered the proceedings fairer. Thus, in establishing their "no harm, no foul" defense, the defendants were not required to present evidence—either through expert testimony or otherwise—establishing that the plaintiffs would have been confined under Correction Law § 402 or under Article 10, or that the plaintiffs would have been committed in the face of testimony by favorable witnesses. Rather, the defendants needed only to have presented *some* evidence sufficient to enable a jury to conclude that the plaintiffs would have been civilly committed following an adversarial proceeding on notice.

This the defendants did. As the district court correctly noted, the trial itself replicated the presentation of proof at a constitutionally adequate pre-commitment hearing, allowing the jury to evaluate what the strength of the State's evidence at such a hearing would have been. J.A. 1301 (Tr. 2905:19-22). Further, as the plaintiffs acknowledge, Pls.' Br. at 45, the examining OMH psychiatrists testified regarding information that they were given in 2005 and conclusions that they drew based on that information, which is presumably what an examining OMH psychiatrist would have testified to at a properly convened and conducted pre-commitment hearing. The cross-examination by the plaintiffs' counsel of the examining OMH psychiatrists—which the district court described as "piercing," J.A. 1301 (Tr. 2903:07-08)—permitted the jury to see "what would [have] happen[ed] if the plaintiff[s] had had counsel" at a pre-commitment hearing in 2005. J.A. 1300 (Tr. 2899:01-05). The jury was well aware that the psychiatrists were employed by OMH, and it was free to take that fact into account in assessing damages. Even though the jury did not have before it the testimony of any court-appointed or plaintiff-retained psychiatrist, it could nevertheless infer from the state psychiatrists' testimony what other psychiatrists might have recommended.

Permitting the defendants to establish their defense based on such evidence might, of course, have placed the plaintiffs at a decided disadvantage in light of the fact that the defendants effectively deprived the plaintiffs of evidence that would have been relevant to establishing causation: a contemporaneous pre-deprivation psychiatric evaluation by an independent party.  But once the defendants carried their burden, the plaintiffs had an obligation to rebut it.  The plaintiffs' challenge in mounting a rebuttal, while perhaps difficult, was not necessarily impossible to overcome.  For instance, they might have presented expert testimony on the variability of medical opinions,[11] or testimony based on a contemporary medical examination that cast doubt on the 2005 evaluations of the OMH doctors.  They did not pursue either possibility, or use any alternative approach.

In light of the evidence at trial, then, a juror would not have been compelled to accept the plaintiffs' view that the defendants had failed to carry their burden on their "no harm, no foul" defense.  The district court therefore did

---

[11] As the Supreme Court has recognized, "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." *Addington v. Texas*, 441 U.S. 418, 430 (1979).  We have also acknowledged that "some psychiatrists tend to favor institutionalization more often than others who tend to favor release." *Goetz v. Crosson*, 967 F.2d 29, 34 (2d Cir. 1992).

not err in denying the plaintiffs judgment as a matter of law on this issue and submitting it to the jury.

V.      Judgment as a Matter of Law on the False-Imprisonment Claims

We conclude that the district court did not err in granting judgment as a matter of law for the defendants on the false imprisonment claims on the basis that these claims duplicated the plaintiffs' procedural due-process claims.  The district court reasoned that the false-imprisonment and procedural due-process claims were duplicative on the grounds that, first, the jury would need to find a procedural due-process violation in order to conclude that the false imprisonment was not otherwise "privileged," and second, the damages for both claims were necessarily the same.  *See* J.A. 1293 (Tr. 2871:20-2874:14).  As to the first basis for the court's decision, the fact that two claims share a common element of proof does not necessarily render them duplicative, and because the plaintiffs' procedural due-process claims were submitted to the jury, the first ground was, standing on its own, insufficient to support the entry of judgment as a matter of law for the defendants on the false-imprisonment claims.  Perhaps it is usually the better practice to allow all liability claims to go to the jury, with careful instructions not to award duplicative damages.  But the district court was correct here that the plaintiffs could not have obtained any additional damages if

their false imprisonment claims had been submitted to the jury, and therefore no new trial is warranted.

"Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect." *Carey*, 435 U.S. at 254. Damages awards in section 1983 suits therefore "must be considered with reference to the nature of the interests protected by the particular constitutional right in question," and accordingly, "the elements and prerequisites for recovery of damages appropriate to compensate injuries caused by the deprivation of one constitutional right are not necessarily appropriate to compensate injuries caused by the deprivation of another." *Id.* at 264-65. Thus, the compensatory damages calculation for different constitutional violations turns on the nature of the injuries suffered even though the amount of compensatory damages awarded is in any event limited to the actual injuries suffered by the plaintiff.

In the procedural due-process context, actual damages are based on the compensation for injuries that resulted from the plaintiff's receipt of deficient process. *See Poventud v. City of New York*, 750 F.3d 121, 135-36 (2d Cir. 2014) (en banc). To calculate such damages, courts must determine whether a different

37

outcome would have been obtained had adequate procedural protections been given. If the outcome would not have been different, the plaintiff is presumptively entitled to no more than nominal damages. *See id.*; *see also Carey*, 435 U.S. at 262-63. If, however, a plaintiff can show that he suffered mental and emotional distress caused by the denial of procedural due process itself (as opposed to the mental and emotional distress caused by, for instance, the incarceration that would have occurred absent the due-process violation), he is entitled to recover actual damages only to that extent. *See Carey*, 435 U.S. at 263 (distinguishing between distress attributable to "the justified deprivation" and that caused by "deficiencies in procedure").

In the false-imprisonment context, "upon pleading and proving merely the unlawful interference with his liberty, the plaintiff is entitled to 'general' damages for [proved injuries arising from] loss of time and humiliation or mental suffering." *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004) (some internal quotation marks omitted).[12]

---

[12] The compensatory damages that may be awarded for false imprisonment fall into two categories: general damages and special damages. General damage is a harm of a sort inseparable from the unlawful restraint. . . . Items of special damage commonly include physical discomfort, shock, or

Although at first blush these categories of damages appear to be different, in this case, all of the damages that the plaintiffs could have sought from a false imprisonment claim were also available on the plaintiffs' procedural due process claim, and were rejected by the jury. The defendants were able to prove to the jury's satisfaction that the plaintiffs would have been confined even if they had been given a pre-confinement hearing. That barred any award of compensatory damages for the plaintiffs' loss of time outside confinement, under both a procedural-due-process and a false-imprisonment theory.

It is possible that other claims for compensatory damages remained viable. For example, the plaintiffs alleged injuries related to the humiliation and mental suffering caused by the unlawfulness of their confinement. J.A. 205-08. But, if actually proven, those injuries would have been similarly available under a procedural due process theory, as *Carey* makes clear. *See Carey*, 435 U.S. at 264 (recognizing that "mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983," even when proper procedures would have had the same result). The jury, by awarding no such

injury to health, loss of employment, and injury to the plaintiff's reputation or credit, and must be specifically pleaded and proven.

*Kerman*, 374 F.3d at 125 (citations, internal quotation marks, and alterations omitted). The plaintiffs here did not seek special damages.

39

damages, necessarily concluded that the plaintiffs had failed to prove any such injury. Remanding this case to the district court to allow the plaintiffs to pursue such damages on a false imprisonment claim would be, in effect, an invitation to retry questions already presented to, and rejected by, a jury.

Because the jury found that the plaintiffs suffered no compensable injury that could be linked to their false imprisonment claim, no new trial on their false imprisonment claim is necessary. We therefore affirm the judgment of the district court on this claim.

VI.    Discovery and Evidentiary Issues

Lastly, the plaintiffs challenge the district court's decision to limit the plaintiffs to four two-hour depositions of the defendants; its decision to permit the defendants to make several statements to the jury that the plaintiffs characterize as inflammatory, irrelevant, and cumulatively prejudicial; and its admission of evidence regarding Brooks's Article 10 hearing in 2009. We reject all three arguments.

*A.    Limitation on Depositions*

"A district court has wide latitude to determine the scope of discovery, and we ordinarily defer to the discretion of district courts regarding discovery matters." *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)

(brackets and internal quotation marks omitted), *cert. denied sub nom. Isaacson v. Dow Chem. Co.*, 555 U.S. 1218 (2009), *and Stephenson v. Dow Chem. Co.*, 555 U.S. 1218 (2009). We see no reason to second-guess the district court's decision to limit the plaintiffs to four depositions of no longer than two hours each of the key players involved in the SVP Initiative. Because of the number of defendants, the number of people involved in the case, and the breadth of its subject matter, the district court's eagerness to keep the discovery process on a tight leash is easily understood. Moreover, as the district court pointed out, the plaintiffs' inability to depose certain witnesses before trial was mitigated by the plaintiffs' counsel's ability to request permission to depose witnesses during the trial—which requests the district court granted as to other witnesses—or to question them outside the presence of the jury. J.A. 1170 (Tr. 2385:13-20). We therefore decline to disturb the judgment on this basis.

B.      *Inflammatory Statements*

In their opening statements, defense counsel referred to the plaintiffs' "serious sex offenses like rape and sexual abuse of children," J.A. 577 (Tr. 28:20-21), "unspeakable crimes," J.A. 583 (Tr. 49:20), and "sickening backgrounds," J.A. 583 (Tr. 51:09-10), as well as the "crimes you cannot even imagine" committed by "people like the plaintiffs," J.A. 583 (Tr. 49:09). Similarly, in their summation,

defense counsel graphically described the plaintiffs' sex offenses; described the plaintiffs as among "the worst criminals in society," J.A. 1345 (Tr. 3078:21-22); and implored the jury to remember that the "six or more victims of these plaintiffs, they are not just numbers; they are mothers, wives, and daughters," J.A. 1347 (Tr. 3086:02-03). Defense counsel also made several statements to which the plaintiffs objected as inaccurate, including that Warren's "plea was based on his having been charged [with] raping his 8-year-old stepdaughter." J.A. 580 (Tr. 39:09-10). The plaintiffs argue that the district court abused its discretion in permitting defense counsel to dwell on and so characterize the plaintiffs' sex offenses, which the plaintiffs argue was both irrelevant and cumulatively prejudicial.

While we are troubled by the specter of a jury deciding this case on the basis of revulsion against the plaintiffs' crimes rather than strictly on the evidence of the alleged deprivation of their constitutional rights, we must nonetheless affirm. First and most important, the plaintiffs did not object to these comments at the time of opening or closing statements. The plaintiffs' arguments in this regard were therefore waived. *Cf. United States v. Terry*, 702 F.2d 299, 317 (2d Cir.) (defendant waived claims based on statement in summation by failure to contemporaneously object), *cert. denied sub nom.*

*Guippone v. United States*, 464 U.S. 992 (1983), *and Williams v. United States*, 461 U.S. 931 (1983).  Second, as to closing statements, both plaintiffs had earlier opened the door to information about their past through their counsel's broad questioning of them on direct examination.[13]

*C.    Admission of Evidence of Brooks's Article 10 Hearing*

We also reject the plaintiffs' argument that the district court abused its discretion in admitting evidence regarding Brooks's Article 10 hearing in 2009. The fact that Brooks was civilly committed following that hearing is probative of whether he would have been committed in 2005.  Indeed, the evidence at Brooks's Article 10 hearing overlapped substantially with the evidence reviewed by the examining OMH psychiatrists in 2005.  The outcome of Brooks's Article 10

---

[13]    For example, as the district court recognized:

> THE COURT:  The door was clearly opened to virtually anything in his past that you have a good-faith basis for asking him.  I am once again surprised that after I spent many minutes yesterday going through all this, that plaintiff then chose to elicit broad statements from Mr. Brooks that opens, it seems to me, opens the door to anything in his past. The one thing that was not opened is the fact that he is presently incarcerated and being held on a burglary charge. Clearly that is just a charge.

J.A. 859 (Tr. 1146:09-17).

hearing was thus probative as to what the results of a 2005 hearing that complied with the Constitution's due-process requirements would likely have been.

Moreover, the district court issued a cautionary instruction to "clue [the jury] in as to why Article 10 may, in [the jury's] discretion, be relevant." J.A. 869 (Tr. 1186:16-18). The district court explained that Article 10 employs different substantive standards; that information may have been available in 2009 that was not available in 2005; and that the plaintiffs contended that it was "too speculative to assume that because someone was confined several years later under Article 10, that they would have been confined if given due process under Article 9." J.A. 868-69 (Tr. 1185:12-1186:14). Inasmuch as the jury was thus fully equipped to assess the import of the Article 10 hearing on Brooks's claim for damages, the district court did not abuse its discretion in admitting this evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.